**Eric LETT, et al., Plaintiffs–Appellees,**

v.

**Suzanne MAGNANT, et al., Defendants–Appellants.**

No. 91–1256.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 15, 1991.

Decided June 1, 1992.

Rehearing and Rehearing In Banc Denied July 10, 1992.

Scott E. Shockley, Asst. U.S. Atty., De-fur, Voran, Hanley, Radcliff & Reed, Muncie, Ind., William P. Tedards, Jr. (argued), Tedards & Herman, Washington, D.C., for plaintiffs-appellees Eric Lett, Lloyd Higer, William Hogan, Elizabeth A. Marsh, Charles Stuart, Carma Bess and Community Care Centers, Inc.

Linley E. Pearson, Atty. Gen., Gordon E. White, Jr., Deputy Atty. Gen. (argued), Office of Atty. Gen., Federal Litigation, Indianapolis, Ind., for defendants-appellants Suzanne Magnant, Myrna Brown, Betty Herman, Ted Hughes, Jean P. Lushin, Mary Lou Reynolds, John Sefrin, Edna Smith, Indiana State Dept. of Public Welfare and Indiana State Bd. of Public Welfare.

Before BAUER, Chief Judge, and POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Hamilton Heights Health Center and six Medicaid recipients who reside there brought this action under 42 U.S.C. § 1983 against the Indiana State Department of Public Welfare (DPW), the Indiana State Board of Public Welfare, and several state officials, alleging that Indiana's Medicaid reimbursement rates are inadequate under the substantive reimbursement standards of the Medicaid Act. *See* 42 U.S.C. § 1396a(a)(13)(A). The plaintiffs also brought a pendent state claim under Ind. Code § 12–1–7–17.2(b). We will, for simplicity's sake, refer to the plaintiffs collectively as "Hamilton Heights," and to the defendants as "the State." The district court granted summary judgment to Hamilton Heights, holding that the State had inadequately reimbursed it under both federal and state statutory requirements. We reverse.

I.

A.

The Medicaid Program, established pursuant to title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, authorizes federal grants to states for medical assistance to low-income persons. Under the program, the federal government contributes funds to cover between fifty and eighty-three percent of the cost of patient care, and the state kicks in the remainder. 42 U.S.C. § 1396d(b). Although participation is voluntary, once a state chooses to do so, it must comply with federal Medicaid laws and regulations. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990); *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Each participating state is required to submit its Medicaid plan to the Health Care Financing Administration (HCFA), the agency within the Department of Health and Human Services that administers the Medicaid program. *See* 42 C.F.R. §§ 447.250–.257. The state plan must satisfy the substantive requirements of 42 U.S.C. § 1396a(a)(13)(A) and the relevant federal regulations governing the policy and methods for setting Medicaid payment rates. *Id.* § 447.200.

The original Medicaid Act required participating states to reimburse facilities for their "reasonable" costs in providing care to Medicaid recipients, regardless of disparities in operating costs or efficiencies; the upshot was that nursing facilities generally were paid the actual costs they incurred in providing care to Medicaid recipients. In 1980, however, Congress enacted the Boren Amendment, which replaced this "reason-

able cost" reimbursement standard with the requirement that states pay rates that the State finds, and makes assurances to the Secretary [of Health and Human Services] *are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

42 U.S.C. § 1396a(a)(13)(A) (emphasis added). This new standard essentially replaced the retrospective "reasonable cost" reimbursement principles—in which providers were paid for the reasonable cost of the services actually provided—in favor of prospective rate-setting, under which rates for various types of services and procedures are fixed in advance. Initially applicable to nursing and intermediate care facilities, the new standard has since been expanded to apply to hospitals, *see* Omnibus Budget Reconciliation Act (OBRA) of 1981, Pub.L. 97–35, § 2173, and intermediate care facilities for the mentally retarded. *See* Pub.L. 100–203, § 4211(b)(2)(A); *Wilder*, 496 U.S. at 502 n. 2, 110 S.Ct. at 2513–14 n. 2.

Construing the Medicaid Act is made difficult by its failure to define "reasonable and adequate," "efficiently and economically operated facilities," or "costs which must be incurred." Moreover, although the statute requires that a state, in making its findings, must judge the reasonableness of its rates against the objective benchmark of an "efficiently and economically operated facility" providing care in compliance with federal and state standards, *see Wilder*, 496 U.S. at 519, 110 S.Ct. at 2523, HCFA has specifically rejected the suggestion that states should be required to define efficient and economically operated facilities, because "the State's methods and standards implicitly act as the State's definition...." *Folden v. Washington State Dep't of Social & Health Servs.*, 744 F.Supp. 1507, 1532 (W.D.Wash.1990) (quoting 48 Fed.Reg. 56,049 (Dec. 19, 1983)). It comes as no great surprise that this definitional abyss has spawned considerable litigation—*see, e.g., Temple Univ. v. White*, 941 F.2d 201 (3d Cir.1991), *cert. denied*, —

U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992); *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306 (2d Cir.1991); *Multicare Medical Center v. Washington*, 768 F.Supp. 1349 (W.D.Wash.1991); *Folden*, 744 F.Supp. 1507; *Michigan Hosp. Ass'n v. Babcock*, 736 F.Supp. 759 (W.D.Mich.1990), for a sampling of recent cases; *see generally* James J. Kennedy III, *The Medicaid Program: Vague Standards Breed Litigation*, 28 St. Louis U.L.J. 351 (1984)—including this action.

## B.

As an initial matter, we summarize the facts and prior proceedings relevant to this appeal. Hamilton Heights, owned by Community Care Centers, Inc., a subchapter "S" Corporation which owns numerous nursing facilities in Indiana, is a private long-term care facility located in Arcadia, Indiana. Approximately 90 mentally retarded and developmentally disabled individuals, including the six individual plaintiffs, currently reside at the facility.

At the time Hamilton Heights brought this action, the Medicaid program classified long-term care facilities into three categories: intermediate care facility (ICF); skilled nursing facility (SNF); and intermediate care facility for the mentally retarded (ICF/MR). (The ICF and SNF categories have since been consolidated into a new category, nursing facility (NF), effective October 1, 1990. *See* 42 U.S.C. § 1396d(a)(14), 1396d(f). ICF/MRs remain a distinct category. *See id.* § 1396d(a)(15); 1396d(d). For simplicity's sake, we refer to ICFs in the present tense.) ICF/MRs provide 24–hour care, habilitative services, and supervision to individuals who are mentally retarded or have related conditions, require an institutional-type setting, and are receiving active treatment. *See id.* § 1396d(d); *Thomas v. Johnston*, 557 F.Supp. 879, 883 (W.D.Tex.1983). ICF care and treatment standards are less rigorous than those for ICF/MRs; unlike ICF/MRs, for example, ICFs are not required to provide each client with active treatment. *See* 42 C.F.R. § 483.440(a)(1) ("Each [ICF/MR] client must receive a continuous active treatment

program...."). As a result, ICF's receive a lower reimbursement rate than ICF/MRs. To take just one example, costs related to staffing are limited in Indiana to 3.75 hours per patient day in ICFs, and to 4.5 in ICF/MRs. *See* Ind.Admin.Code tit. 470 r. 5–4.1–21, –25.

In 1984, the Indiana State Board of Health (SBH) established what might be viewed as an "intermediate ICF" in the State of Indiana—a level of care between ICF and ICF/MR. This level of care, labelled "Rule 7," applies to any Indiana ICF (*i.e.*, any facility licensed under Ind.Code 16–10–4) that serves three or more developmentally disabled individuals. *See* Ind.Admin.Code tit. 410 r. 16.2–7–1. It is in this middle ground that Hamilton Heights currently operates. Providers, such as Hamilton Heights, designated as Rule 7 ICFs, must meet more stringent requirements than ordinary ICFs; among other things, they must develop written program statements, provide in-service training, require staff working with developmentally disabled residents to attend staff development programs, and provide a program for developmentally disabled residents which satisfies various requirements. *See generally id.* tit. 410 r. 16.2.7–2 to –5. Should a Rule 7 facility fail to satisfy these standards, the SBH can hold it in noncompliance and the DPW can subject it to decertification as a Medicaid facility. *See, e.g., id.* tit. 410 r. 16.2–7–1(b).

As the Rule 7 enforcement procedures indicate, Indiana's long-term care facilities operate under a state health care regime in which separate agencies have distinct but interrelated roles. The SBH is responsible for licensing and certification of Indiana health care facilities, while the DPW administers the Medicaid program and establishes Medicaid reimbursement rates for these licensed facilities. *See* Ind.Code § 12–1–7–17.6. The DPW can reimburse a facility at a given level only if the facility has been certified and licensed at that level by the SBH—so, for example, the DPW can reimburse a facility at an ICF/MR rate only if the SBH has licensed and certified that facility as an ICF/MR. And therein lies the problem. Because Hamilton

Heights houses approximately 90 developmentally disabled residents, the SBH categorizes it as a Rule 7 ICF; however, because Rule 7 is strictly a state (not a federal Medicaid) classification, the DPW categorizes the facility for Medicaid reimbursement purposes as an ordinary ICF. Hamilton Heights maintains that it is more costly to comply with Rule 7 ICF standards than with ordinary ICF requirements, and that the increased costs of compliance necessitate a concomitant increase in Hamilton Heights' reimbursement rate.

Hamilton Heights filed a complaint on April 24, 1990, seeking, among other things, an order declaring that the method used by the DPW to determine Hamilton Heights' Medicaid reimbursement rate was arbitrary and capricious in violation of 42 U.S.C. § 1396 and Ind.Code § 12–1–7–17.-2(b), and directing the DPW to implement a reimbursement plan for facilities such as Hamilton Heights and to redetermine Hamilton Heights' Medicaid rate. The district court conducted an evidentiary hearing on June 26, 1990, and granted a preliminary injunction. The court issued an order requiring the DPW to reset Hamilton Heights' Medicaid reimbursement rate at a level equal to the facility's documented cost rate from January 1, 1989, to July 6, 1990, and to readjust the rate if the facility's costs increased prior to trial. *Lett v. Magnant*, No. IP90–1053–C (S.D.Ind. July 10, 1990) (*Lett I*) (enforcing oral ruling of July 6, 1990). Thereafter, the plaintiffs filed a motion for summary judgment, which the court granted, finding that the State had failed to comply with the substantive mandates of state and federal Medicaid reimbursement statutes. *Lett v. Magnant*, No. IP 90–1053–C (S.D.Ind. Dec. 19, 1990) (*Lett II*). The district court resolved this issue in large part by relying upon its earlier reasoning in *Lett I*. We find that, as a result, the substantive reimbursement standard at issue was not examined adequately.

## II.

The only issue before us is whether the Indiana DPW failed to comply with substantive federal and state requirements in

establishing Medicaid reimbursement rates for Hamilton Heights. Since this is an appeal from a grant of summary judgment, we review the record *de novo* to determine whether there is a genuine issue of material fact and the law was applied correctly, *see* Fed.R.Civ.P. 56(c); 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kanne, *Federal Practice and Procedure: Civil 2d* § 2716, at 593–94 (1983), and whether the court properly interpreted the statutory provisions at issue. *See Erie County Geriatric Center v. Sullivan*, 952 F.2d 71, 78 (3d Cir.1991); *cf. Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (reviewing court should exercise plenary review over district court's interpretation of state law). We apply the same standard as that employed by the trial court pursuant to Fed.R.Civ.P. 56(c), and assess the record in the light most favorable to the State, drawing all factual inferences in its favor. *See Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir.1990). Hamilton Heights bears the burden of establishing that the State plan is either arbitrary and unreasonable or inadequate. *See Wisconsin Hosp. Ass'n v. Reivitz*, 733 F.2d 1226, 1236 (7th Cir.1984); *Mississippi Hosp. Ass'n v. Heckler*, 701 F.2d 511, 517 (5th Cir.1983). Essentially, we must determine whether the judge would be required to grant a directed verdict to Hamilton Heights if this were the trial rather than a summary judgment proceeding. *See Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

## A.

■ Before we reach the merits of the case, we address, *sua sponte*, whether Hamilton Heights may properly sue the named defendants in federal court for alleged violations of the Medicaid Act. The named defendants are various state officials acting in their official capacities, along with the State Department of Public Welfare and the State Board of Public Welfare.

We must dismiss the claims against the Department of Public Welfare and Board of Public Welfare. Personhood is an essential element of a § 1983 claim, and in *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court held that a state is not a "person" for purposes of § 1983 and therefore cannot be sued in its own name. This reasoning applies to arms of the state, such as state agencies, as well. *Id.* at 70, 109 S.Ct. at 2311. Because this action is for prospective relief, however, we reach a different result in regard to the official capacity defendants. As *Will* observed, "[o]f course a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State,'" *id.* at 71 n. 10, 109 S.Ct. at 2311 n. 10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)), a distinction which arises out of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (actions for prospective relief against state officials not within bar of Eleventh Amendment). *See Wisconsin Hospital Ass'n v. Reivitz*, 820 F.2d 863, 867 (7th Cir.1987) ("A suit under *Ex parte Young* envisages a situation in which state officials are being told in effect to leave the plaintiff alone. The relief sought is against the officials; the state treasury is not directly affected."); *see also Edelman v. Jordan*, 415 U.S. 651, 664–65, 94 S.Ct. 1347, 1356–57, 39 L.Ed.2d 662 (1974) (unlike *Ex parte Young*, where relief was prospective only, suit for retroactive relief against state officials is in essence one against the state because funds to satisfy award must inevitably come from the general revenues of the State). Therefore, we properly have jurisdiction over the official capacity defendants.

■ One more jurisdictional issue remains. In addition to its § 1983 claim, Hamilton Heights contends that the DPW violated Indiana law through its inadequate reimbursement rate; in its summary judgment order, the district court agreed. *See Lett II* at 8. But this is a pendent claim.

256

*See* Complaint at 2. The Supreme Court in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 117–121, 104 S.Ct. 900, 911, 917–19, 79 L.Ed.2d 67 (1984), held that the Eleventh Amendment bars a federal court from considering a pendent state law claim against state officials. Therefore, the claim that the DPW violated Indiana law must be dismissed. *See Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337 (7th Cir.1987); *see also Massachusetts Fed'n of Nursing Homes,* 772 F.Supp. 31, 36 (D.Mass.1991).

### B.

In supporting its motion for summary judgment, Hamilton Heights stated correctly that the DPW is governed by 42 U.S.C. § 1396a(a)(13)(A); it then proceeded, however, to quote the statute incorrectly, asserting that it requires a state's reimbursement rate to be "reasonable and adequate to meet the costs that *are* incurred by efficiently and economically operated facilities ..." Pl.'s Mot. for Summ.J., Exh. A at 1 (emphasis added).

This misstates the law. What Hamilton Heights actually set forth was the language and standard of the "reasonable cost" reimbursement standard in place *prior* to the enactment of the Boren Amendment. Post–Boren, states are merely required to pay rates "reasonable and adequate to meet the costs which *must be* incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A) (1991) (emphasis added). As observed by a number of courts, including our own, a primary purpose of the Boren Amendment and its shift in reimbursement standards (*i.e.,* from "are incurred" to "must be incurred") was cost containment. *See Reivitz,* 733 F.2d at 1233; *see also Pinnacle,* 928 F.2d at 1309–10 (Boren Amendment enacted to improve efficiency and to provide states greater flexibility in developing reimbursement methods); *Erie County Geriatric Center,* 952 F.2d at 77 (Boren Amendment reimbursement standard a "laudable effort to contain escalating Medicaid costs"); *Alabama Hosp. Ass'n v. Beasley,* 702 F.2d 955, 958 (11th Cir.1983) ("[T]he new 'efficient cost' standard is designed to lower the threshold of permissible reimbursement rates."). Under this standard, a state cannot rely solely on budgetary considerations in setting its reimbursement rates, but it may consider them to a certain extent. *See Reivitz,* 733 F.2d at 1235.

That Hamilton Heights' misquote was more than a mere typographical error is demonstrated by its repeated reiteration of the former legal standard in urging summary judgment. Hamilton Heights characterized the standard as "the reimburseable [sic] cost standard under both the Federal Boren Amendment and the Indiana State Medicaid legislation," Pl.'s Summ.J.Br. at 2 n. 2 (citations omitted), and claimed that "[t]he only legal issue for determination is whether the DPW can refuse to reimburse Hamilton Heights at its full costs solely because Hamilton Heights is an ICF/Rule 7 facility and not either an ICF (geriatric) facility or an ICF/MR facility." *Id.* at 4. It further alleged that the material facts necessary to decide this case are those "which provide the answer to one essential question":

> Are the "documented costs" of Hamilton Heights *reasonably necessary* in order for Hamilton Heights to provide "care and services in conformity with state and federal laws, rules and regulations and quality and safety standards ..." in an "efficient" and "economic" manner?

*Id.* at 3 (emphasis added). Hamilton Heights' characterization of the applicable reimbursement standard, in our view, rests on the false premise that a state is required to reimburse any efficient and economic facility for its reasonable, actual costs. This merely transmutes the post-Boren prospective rate-setting approach into the pre-Boren retrospective "reasonable cost" standard.

■ Under the current reimbursement standard, a state's inadequate reimbursement of one efficiently and economically operated facility does not necessarily constitute a Boren Amendment violation. *See, e.g., Mary Washington Hosp., Inc. v. Fisher,* 635 F.Supp. 891, 899 (E.D.Va.1985).

Rather, the term "reasonable" under the Boren Amendment embraces the notion that a state must reasonably *categorize* its rates. *See, e.g., Reivitz*, 733 F.2d at 1233. As the Third Circuit has observed,

> It follows from the departure from a cost-driven reimbursement standard that a state's plan does not violate the substantive provision of the reasonable and adequate requirement simply because it fails to reimburse one efficiently operated [facility] its actual costs. What matters, rather, ... is whether the reimbursement rates ... in the aggregate are arbitrary and capricious.

*West Virginia Univ. Hosps., Inc. v. Casey*, 885 F.2d 11, 26 (3d Cir.1989), *aff'd on other grounds*, —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (dealing only with issue of attorney's fees). Indeed, it is noteworthy that the 1981 OBRA drafters "contemplated that the rates fixed in compliance with its provisions might not be sufficient to keep *every* hospital participating in the Medicaid program." *Mary Washington Hosp.*, 635 F.Supp. at 899–900 (citing 46 Fed.Reg. 47970 (Sept. 30, 1981) (commenting on House Report 3982)) (emphasis in original).

■ For its part, the district court apparently adopted at face value Hamilton Heights' flawed characterization of the Boren reimbursement standard. In granting the preliminary injunction, it, too, quoted the pre-Boren language. *Lett I* at 2. After the State correctly set forth the proper standard in its response to the plaintiffs' summary judgment motion, *see* Def.'s Mem. in Response to Pl.'s Mot. for Summ.J. at 4, the district court acknowledged the semantic distinction between the pre- and post-Boren standards but did not alter its legal analysis. First, the court found that the "documented, uncontested costs" incurred by the facility "are reasonably necessary for the facility to provide care and services efficiently and in conformity with state and federal law." *Lett II* at 4. It then rejected the State's argument that Rule 7 is not a separate level of care category for Medicaid reimbursement purposes. *Id.* at 4–5. Finally, quoting the post-Boren language, the district court

stated that while "the Boren Amendment may be understood not to require States to reimburse actual costs, the undisputed facts show that Hamilton Heights is an efficient, economic facility, that its costs are reasonable, and that these costs *must* be incurred in order to provide legally sufficient care and services. Therefore, the State must reimburse these costs, and the failure to do so was arbitrary and capricious." *Id.* at 6 (emphasis in original). But this approach merely collapses the post-Boren language into the pre-Boren reasonable costs standard. As such, it was not an appropriate legal basis for the district court's grant of summary judgment in favor of Hamilton Heights, and we cannot affirm unless we find sufficient support in the record using the appropriate analysis.

### C.

■ In reviewing the DPW's substantive compliance with the Boren Amendment, we keep in mind that "[a] presumption of validity attaches to agency action, and the burden of proof rests with the party challenging such action," *Heckler*, 701 F.2d at 516; *see Pinnacle*, 928 F.2d at 1313; *Colorado Health Care Ass'n v. Colorado Dep't of Social Servs.*, 842 F.2d 1158, 1164 (10th Cir.1988); *Reivitz*, 733 F.2d at 1236; *Illinois Health Care Ass'n v. Bradley*, 776 F.Supp. 411, 422 (N.D.Ill.1991); *cf. Wilder*, 496 U.S. at 520 n. 18, 110 S.Ct. at 2523 n. 18 (noting Courts of Appeals' general agreement with deferential standard of review when state has complied with Boren Amendment's procedural requirements), and we review the record before the district court at the time it issued its ruling.

In 1989, Hamilton Heights pursued an administrative appeal against the SBH to receive permission to apply for ICF/MR certification. (ICF/MR status, recall, means a higher reimbursement rate.) After an administrative hearing, Hamilton Heights received permission in fall 1989 allowing it to pursue ICF/MR status. Shortly thereafter, in April 1990, it filed this lawsuit—claiming, essentially, that it is entitled to an increased reimbursement level based on the costs it incurs as an Rule 7

ICF, and that its plans to obtain ICF/MR certification are irrelevant to the present action. It would seem a bit curious that, having brought an administrative proceeding to receive permission to apply to become an ICF/MR, Hamilton Heights now claims this is of no moment and that its rates should be based on its costs as a Rule 7 ICF.

But perhaps not. A statement by Hamilton Heights' counsel at the preliminary injunction hearing is instructive:

> [I]ronically enough . . . it may be that the relief that Community Care is seeking here is the very means by which they can assure themselves of an accelerated path to the ICFMR category. As we've seen, it's a little different when you're just starting a business and when you're running a business with ninety or a hundred people in it already, to try to totally transform that business into something else, and not drop the ball at the same time. . . . [R]efusal to grant this relief may be the very thing that makes ICFMR less probable.

Tr. at 146 (William Teddards). This is not "ironic," it is precisely the point. Finding it difficult to make ends meet while setting out to satisfy the ICF/MR certification standards, Hamilton Heights pursued this litigation in an effort to receive interim funding. Indeed, the district court acknowledged as much. *See Lett I* at 4. The crux of Hamilton Heights' claim, then, is as follows: caught in a catch–22, it cannot obtain a higher rate until it is licensed as an ICF/MR, but it cannot afford to become an ICF/MR unless it obtains a higher rate. While this may well be the case, an attack on the DPW's substantive compliance with Medicaid reimbursement standards is an inappropriate means for Hamilton Heights to obtain its interim funding.

Indeed, we find it somewhat disingenuous that Hamilton Heights, in its present attempt to receive a "Rule 7 ICF" rate of reimbursement, argues that its services differ from those provided by ICF/MRs—despite the fact it claimed just the opposite in its upgrading proceeding with the SBH. Owner Myron Bradburn testified at the preliminary injunction hearing that Hamilton Heights serves "predominantly severely and profoundly mentally retarded who have a large amount of multiple handicaps and medical needs that sometimes aren't addressed in an ICFMR, where it's more active treatment." Tr. at 66. Similarly, counsel for Hamilton Heights told us at oral argument that Rule 7 was created to take into account people with severe multiple medical disabilities *and* mental retardation, unlike ICF/MRs, which do not serve residents with multiple medical disabilities.

Yet Hamilton Heights willingly compares its services to those offered by Indiana ICF/MRs when arguing that it should be reimbursed at a comparable level. *See, e.g.,* Appellee's Br. at 4 ("The cost of caring for similar people in other facilities, such as North Willow and Muscatatuck State Hospital (ICF/MRs), is well in excess of $100 per resident per day."). The district court relied on such comparisons in determining that Hamilton Heights should receive a greater reimbursement rate. *See Lett II* at 6. Moreover, Bradburn's assertions notwithstanding, Hamilton Heights Administrator Patricia Cook testified that the type of care Hamilton Heights offers is "very similar" to that provided by Muscatatuck, a state ICF/MR. *See* Tr. at 103–04.

Perhaps most telling, Hamilton Heights' own consultant had recommended during the administrative hearing with the SBH that Hamilton Heights become licensed as an ICF/MR, and maintained that such certification would enable the facility to receive the necessary funding. *See* Tr. at 40 ("The appropriate level of care is ICFMR DD. . . . This would provide the facility with much-needed funding to provide additional resources. . . . These residents do have a statutory right for appropriate treatment.") (testimony of Beverly Breitfield, reading report of consultant David Russell). Now attempting to distance itself from that report, *see* Tr. at 40 (Breitfield testimony) (noting disagreement with Russell's ICF/MR recommendation), Hamilton Heights argues that the "statutory mandated level of care" to its residents is the care mandated by Rule 7. *See* Appellee's Br. at 4.

The DPW has expressed its willingness to reimburse Hamilton Heights at increased rates—once the facility is certified as an ICF/MR. *See, e.g.,* Tr. at 148 (Gary Kyzer–Sheeley testimony). The DPW cannot reimburse Hamilton Heights at an ICF/MR level until it is licensed at that level. *Cf.* 42 C.F.R. § 442.12(a) (DPW cannot enter into a provider agreement with an ICF/MR unless "the State survey agency [SBH] has certified the facility ... to provide those services."). As Indiana's Medicaid director stated:

> The problem here is that this particular facility has not gone through the process of obtaining the proper certification and proper licensing, and the Welfare Department is not the certification agency, it is not the licensing agency, it cannot wave a magic wand and make this facility an ICFMR. It is something that they have to do for themselves, and they haven't done it.

Tr. at 148–49 (Kyzer–Sheeley testimony).

Hamilton Heights tries to escape that fact by putting a different spin on the issue, characterizing the nature of its problem as the DPW's failure to recognize "provider specialization"—*i.e.,* the "crucial but erroneous assumption that all facilities within the same general level of care category had a 'mix' of residents with, on the average, about the same need for services," Appellee's Br. at 12 (quoting *Thomas,* 557 F.Supp. at 910). Hamilton Heights opened its doors in 1972, before the inception of the ICF/MR standard of care, and, according to Hamilton Heights, unlike other facilities, it began to develop a market for individuals with special needs and ultimately developed an expertise in that area. *See* Tr. at 61–62 (Bradburn testimony). By the time the ICF/MR category was established—along with the various requirements to achieve that status—Hamilton Heights already cared for a great number of such individuals (the average resident has lived at Hamilton Heights for approximately nine years), thereby making it more difficult to meet certification standards. *See* Tr. at 41–42 (Breitfield testimony) ("It's real easy to have everything just right with ten, fifteen residents. I now

have ninety, and everything has to be perfect once the surveyors come...."); *see also* Tr. at 85–86 (Bradburn testimony) ("We can't afford to do the conversion, all the while subsidizing the operation of the facility.").

The 154–bed facility has added no new residents since November 1987, and, in fact, is losing residents; the federal government no longer permits admission of patients with a primary or secondary diagnosis of mental retardation and developmental disability into ordinary ICFs, Tr. at 66 (Bradburn testimony), and at the same time those Hamilton Heights patients with less severe disabilities are being outplaced to group homes. Tr. at 30 (Breitfield testimony); Tr. at 81 (Bradburn testimony). Thus, the facility's client base is diminishing, and those patients who remain have the most severe disabilities—and require the most expensive treatment. This, claims Hamilton Heights, further aggravates its dilemma. The cost of delivering care to its residents averaged approximately $80 per resident per day in 1989, yet its reimbursement rate was merely $47.44. (Those costs had risen to approximately $82.90 per day in 1990.) Net operating losses exceeded $800,000 in 1988 and $1.2 million in 1989, and averaged between $60,000 and $150,000 per month in 1990. Hamilton Heights maintains that the DPW refuses to recognize this unique situation and the costs it must incur to comply with Rule 7.

Hamilton Heights analogizes its situation to that of the providers in *Thomas v. Johnston, supra,* who likewise proffered a provider specialization argument. Unlike Hamilton Heights, however, the *Thomas* providers already were certified as ICF/MRs (the highest level within that state's reimbursement scheme) and still received inadequate reimbursement. Here, Hamilton Heights does not contend that its rates would be insufficient were it licensed as an ICF/MR; rather, it maintains that it cannot afford to convert to that status given its current rate of reimbursement. This is not an argument that the rates, at a systemic level, fail to take provider specialization

into account. Indeed, Hamilton Heights neglected to argue, let alone show, that any other Rule 7 ICF faces a similar problem. Moreover, the procedural posture of *Thomas* was that of a preliminary injunction motion. The court took note of that fact, stating that its determination that the state did not take adequate steps to investigate the problem of provider specialization "should not be taken to mean that this Court has found as a matter of fact that a problem of provider specialization exists...." 557 F.Supp. at 912. Rather, the court stated, it "simply does not have enough information upon which to base such determinations, nor is it appropriate for this Court to do so, especially at such an early stage in this litigation." *Id.*

Despite Hamilton Heights' attempt to recharacterize the nature of its dilemma, we find its "provider specialization" characterization unpersuasive. The testimony does not establish that the DPW refuses to recognize varying levels of care; indeed, Indiana's Medicaid director testified that the rate structure is based on general uniform rates that are then tailored to individual facilities. *See generally* Tr. at 130–37 (Kyzer–Sheeley testimony). Rather, the issue (again) comes down to Hamilton Heights' failure to achieve ICF/MR certification. And, according to the DPW, it is incumbent upon the facility seeking a higher reimbursement rate to obtain the appropriate certification—in this case, as an ICF/MR.

Hamilton Heights repeatedly maintains that it is not *improperly* licensed as a Rule 7 ICF, and therefore should not have to obtain ICF/MR status to obtain greater reimbursement. We disagree. Proper licensing as a Rule 7 ICF indicates that Hamilton Heights is permitted to operate within that category; it does not mean that it need not pursue ICF/MR status to receive a better rate:

Court: And so in fact, if I believe this testimony, the Board of Health comes in and put [sic] the same onus on these (Rule 7) folks as they do on the ICFMR, which would presumably ... be the same for them to have—the same cost to pay for there as if these same services were being prepared and executed in an ICFMR.

Kyzer–Sheeley: All the more reason to pursue due diligence and become an ICFMR, so that one could be compensated for providing those types of services—if indeed the conclusions that we've reached is correct, that they are having that onus placed on them.

*See* Tr. at 128–29. We find nothing wrong with the DPW placing this onus on the facility. Moreover, if Hamilton Heights "had applied for ICFMR status earlier and was now an ICFMR it would be getting a rate which was conceivably much higher that [sic] even what it's requesting today." Tr. at 127 (Kyzer–Sheeley testimony). It is not unreasonable for the DPW to maintain that Hamilton Heights is an anomaly, and that it cannot set up a reimbursement scheme tailored to each participating facility.

*Mary Washington Hospital, Inc. v. Fisher, supra,* is instructive here. The Medicaid facility there contended that it was "exceptional in its peer group" because of its status as a "sole community provider," a hospital offering a wider range of services than normal because of its role as the only hospital in the community. 635 F.Supp. at 896. The court, after noting the general principle that "reasonable *general* rates may not be reasonable and adequate in *particular* cases to assure reasonable access and to cover the costs of efficiently and economically running" a nursing facility, observed,

This may be due to some special fact about a hospital or a group of hospitals that the state did not take into account in setting the general rate. Or, although a general rate may originally have been adequate for a given hospital, it may become inadequate when technology or other circumstances necessitate a change in the services being provided.

*Id.* at 903. Of particular relevance, the plaintiff in *Mary Washington*, unlike Hamilton Heights here, did not hinge its entire argument on the state's alleged failure to

meet the Medicaid Act's substantive reimbursement requirements. Rather, the hospital also alleged a lack of procedural compliance with the statute—a failure to make the requisite "findings," *see* § 1396a(a)(13)(A) (state must pay rates which it "finds and makes assurances ... are reasonable and adequate ...")—and an inadequate administrative appeals process. *See* 42 C.F.R. § 447.253 ("The Medicaid agency must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates.").[1] The court found that the only violation of the law was the plan's defective appeals procedure. 635 F.Supp. at 906.

Here, as noted, Hamilton Heights relied on a single ground in pursuing summary judgment. Perhaps it would have been in a better position adding a challenge to Indiana's administrative appeals system but, although it occasionally alluded to that argument, *see, e.g.,* Tr. at 96–98, 137–39, it never made it. *See* Summ.J.Br. at 4 ("*only* legal issue for determination is whether the DPW can refuse to reimburse Hamilton Heights at its full costs solely because Hamilton Heights is an ICF/Rule 7 facility and not either an ICF (geriatric) facility or an ICF/MR facility.") (emphasis added). It is not our role to scour the record for potentially meritorious legal arguments, *see Beard v. Whitley County REMC,* 840 F.2d 405, 408–09 (7th Cir.1988); *Friedel v. City of Madison,* 832 F.2d 965, 969 (7th Cir.1987), and Hamilton Heights must live with its tactical decision. *Cf. Burdett v. Miller,* 957 F.2d 1375, 1380 (7th Cir.1992) (courts rely on parties to frame issues and are not obliged to point out arguments or inquiries that counsel have overlooked).

We can, in an appropriate case, grant summary judgment for the nonmoving party even though it made no formal cross-motion under Rule 56. 10A *Federal Practice and Procedure: Civil 2d, supra,* § 2720, at 33–34; *see, e.g., Jensen v. Snellings,* 841 F.2d 600, 618 (5th Cir.1988) (reversing district court's grant of summary judgment in favor of moving party and granting summary judgment to nonmoving party); *see also Lindsey v. Baxter Healthcare Corp.,* 757 F.Supp. 888, 900 & n. 22 (N.D.Ill.1991). We find this to be such a case. It is neither arbitrary and capricious nor unreasonable for the Indiana DPW to require Hamilton Heights to be certified as an ICF/MR in order to receive enhanced reimbursement rates. The DPW is willing to reimburse Hamilton Heights for those expenses it must incur, provided that Hamilton Heights obtains ICF/MR status. The DPW merely requires that "there be some uniformity between facilities, and ... designate[s] the facilities which are ICF's ICF, and those that are ICFMR ICFMR, and pay[s] all of them appropriately." Tr. at 137 (Kyzer–Sheeley testimony). Such an approach does not violate federal law.

We reverse the district court's grant of summary judgment in favor of Hamilton Heights, and grant summary judgment in favor of the State.

---

1. Hamilton Heights' situation is also similar to that of the plaintiff in *Capitol Hill Hospital v. District of Columbia,* 769 F.Supp. 16 (D.D.C. 1991). There, as here, an individual facility argued that the substantive Medicaid reimbursement rates violated the Boren Amendment because the rates were not reasonable and adequate to meet the facility's costs. The *Capitol Hill* court determined that the facility had failed to pursue administrative review under 42 C.F.R. 447.253(c), which gives facilities the right to pursue administrative review of any dispute over a state's determination of reimbursement rates. *See* 42 C.F.R. 447.253(c). The court found that although the facility had a right to sue under *Wilder,* it should first proceed with an administrative challenge.