INDIANA STATE BOARD OF PUBLIC WELFARE, Indiana Department of Public Welfare, Suzanne Magnant, in her capacity as Administrator of Indiana Department of Public Welfare, Appellants,

v.

TIOGA PINES LIVING CENTER, INC., Communicare of Indiana, Inc., d/b/a American Village Retirement Community, Bloomington Convalescent Center, Inc., Meadow Heights Nursing Center, Inc., d/b/a Lincoln Hills of New Albany, Appellees.

INDIANA STATE BOARD OF PUBLIC WELFARE, Indiana Department of Public Welfare, Suzanne Magnant, in her capacity as Administrator of Indiana Department of Public Welfare, Appellants,

v.

COMMUNITY CARE CENTERS, INC., and the Indiana Health Care Association, Appellees.

Nos. 30S01–9208–CV–00621, 30S01–9208–CV–00621.

Supreme Court of Indiana.

Oct. 29, 1993.

Pamela L. Carter, Indiana Atty. Gen., Gordon E. White, Jr., Deputy Atty. Gen., Indianapolis, Charles A. Miller, S. William Livingston, Jr., Mark H. Lynch, Lanny A. Breuer, Anna P. Engh, Covington & Burling, Washington, DC, for appellants.

Gregory A. Huffman, Steven D. Murphy, Scott E. Shockley, Defur, Voran, Hanley, Radcliff & Reed, Muncie, William P. Tedards, Tedards & Herman, Washington, DC, for appellees Community Care Centers, Inc.

David F. McNamar, Randall R. Fearnow, Janet A. McSharar, Alastair J. Warr, McNamar, Fearnow & McSharar, Michael

R. Franceschini, Brett R. Fleitz, Steers Sullivan P.C., Indianapolis, Michael J. Tosick, Greenfield, for appellees Tioga Pines Class.

Paul R. Black, McHale, Cook & Welch, P.C., Indianapolis, Malcolm J. Harkins, III, Mark J. Biros, David M. Levine, Proskauer Rose Goetz & Mendelsohn, Washington, DC, for appellees/cross-appellants.

## ON PETITION TO TRANSFER

DeBRULER, Justice.

The plaintiff nursing homes in these two appeals (hereinafter, collectively, "Providers") successfully challenged the Medicaid reimbursement system in Indiana. Defendants, Indiana State Board of Public Welfare, Indiana Department of Public Welfare,[1] and Suzanne Magnant, in her capacity as Administrator of the Indiana Department of Public Welfare (hereinafter, "the State"), appeal from adverse judgments rendered in the Hancock Circuit Court and the Blackford Circuit Court. The Court of Appeals consolidated the pending two appeals in accordance with Ind. Appellate Rule 5(B), since there are common questions of law and fact. Because these appeals involve a question of law of substantial public importance requiring an early determination, this Court took jurisdiction of the consolidated appeal from the Court of Appeals pursuant to App.R. 4(A)(10) (now App.R. 4(A)(9)). This Court held oral argument on April 28, 1993.

The class action captioned *Tioga Pines Living Center, Inc. v. Indiana State Board of Public Welfare* was brought on behalf of approximately 785 Medicaid-certified, skilled nursing facilities and intermediate care facilities in Indiana. The complaint was filed pursuant to 42 U.S.C. § 1983 and Ind.Code § 34–4–10–1, *et seq.*, known as the Uniform Declaratory Judgments Act. The Hancock Circuit Court, Ronald L. Gottschalk, J., entered a "Partial Final Judgment Entry" on March 25, 1992, from which the State appeals. The major

elements of the partial final judgment are as follows:

1) the State's Medicaid reimbursement rules violated the federal Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), and its state counterpart, I.C. § 12–1–7–17.6(b), because the reimbursement rules employed the Gross National Product implicit price deflator (GNP/ipd) as a cap upon any annual reimbursement rate increase;

2) the use of the tests of reasonableness in setting reimbursement rates was invalid, because the tests were never duly promulgated;

3) because of the illegalities of the reimbursement regulations, class members were under-reimbursed their reasonable costs in providing care in conformance with federal and state regulations;

4) the State should repay class members for all under-reimbursement from January 24, 1988 to March 31, 1991;

5) the State is liable for the class' and intervenors' attorney fees and expenses in the amount of $565,000.00 and $667,907.00, respectively, pursuant to 42 U.S.C. § 1988; and

6) the class' counsel is entitled to attorney fees in the amount of 25% of the fund created pursuant to Ind. Trial Rule 23(D), or $10,075,079.00, plus expenses.

A procedure was set up whereby each class member could present a claim against the fund to a court appointed Master and for the State to challenge the individual claims.

In the case captioned *Community Care Centers, Inc. v. Indiana State Board of Public Welfare*, plaintiff nursing homes sought declaratory and injunctive relief pursuant to Indiana statutory provisions. The Blackford Circuit Court, Bruce C. Bade, J., entered three orders granting partial summary judgment, dated May 17, 1990, January 15, 1991 and December 16, 1991. The State appeals all three orders.

---

1. Prior to 1992 the Indiana Department of Public Welfare (DPW) was the state agency designated to administer the Medicaid program. DPW has now become the Division of Family and Children of the Family and Social Services Administration, and the Office of Medicaid Policy and Planning was created to administer Medicaid. *See* I.C. § 12–8–6–1 and § 12–15–1–1 (Burns 1992).

The May 17, 1990 partial summary judgment enjoined the State from utilizing the rules promulgated in 1988, the "tests of reasonableness,"[2] because there was an absence of a quorum present at the Board of Public Welfare meeting at which the tests were promulgated.

The January 15, 1991 partial summary judgment enjoined the State from using the GNP/ipd maximum annual rate increase limiter as the sole determinant in setting nursing home rates. In its January 15, 1991 partial summary judgment order, the trial court incorporated its findings and conclusions from a previous order granting Community Care a temporary restraining order on this same issue. In that TRO, dated June 5, 1990, the trial court found that although the State applies five rate limiters to a provider's calculated rate, the GNP/ipd limiter may be the sole determinant of a provider's reimbursement rate.

The December 16, 1991 summary judgment enjoined the State from using certain aspects of the tests of reasonableness. Specifically, the State was enjoined from making line item comparisons and comparisons without regard to size in setting Community Care's reimbursement rates.

The effect of the summary judgments is that in setting rates for the Community Care facilities, the State is prohibited from using the tests of reasonableness or GNP/ipd limiters and is required to make comparisons taking into account size of facilities.

The following issues are raised on appeal:

(1) whether the trial courts were in error in concluding that the State employed an illegal methodology due to the use of the GNP/ipd annual rate increase limiter and the tests of reasonableness in determining Medicaid reimbursement rates;

(2) whether the trial court in *Tioga Pines* was in error in awarding damages; and

(3) whether the *Tioga Pines* trial court's attorney fees award was proper.

Congress established the Medicaid program in 1965. It is a government program, jointly administered by the states and the federal government, designed for assuring payment for health care given those who cannot pay. Hospital care, nursing home care, physician services, and medicines are included. Annual Medicaid payments in Indiana total several billion dollars. The burden of these payments on a participating state, such as Indiana, has been assumed by both the state and the nation as a whole, the federal government paying the greater share. The state bears the primary responsibility for initially establishing a state plan conforming to federal requirements; however, this function is subject to oversight and approval by the federal government through the Health Care Financing Administration ("HCFA"). *See generally* Eleanor D. Kinney, *Rule and Policy Making for the Medicaid Program: A Challenge to Federalism*, 51 Ohio State L.J. 855 (1990) [hereinafter *Medicaid Program* ].

The State's reimbursement plan comprises its detailed rules and regulations promulgated pursuant to authority granted by statute. The State's authority to make such rules and regulations during the years 1978, 1983, and 1988, when amendments and publications of the rules having particular relevance to these cases were promulgated, was delegated to the State in a 1936 statutory provision:

[The state department] may make such rules and regulations and take such action as may be deemed necessary or desirable to carry out the provisions of this act and which are not inconsistent therewith.

Burns Ann.Ind.Stat. § 52–1104(f) (1964 Repl.)[3] Providers did not challenge this

---

**2.** The details of the tests of reasonableness are codified at 470 IAC 5–4.1–10(3) (1988).

**3.** This statute has been reformulated and recodified a number of times. The reformulation applicable in 1988 read:

[The state department] may make such rules and take such actions as are necessary or desirable to carry out this article and which are not inconsistent with this article.

I.C. § 12–1–2–3(f) (Burns 1988). This statute was repealed in 1992.

delegation of authority, but based their claims upon the proposition that the DPW's rules and regulations were not valid.

■■■ It is elementary that the authority of the State to engage in administrative action is limited to that which is granted it by statute and that administrative action within such limitation has the force of law. *Blue v. Beach* (1900), 155 Ind. 121, 56 N.E. 89. Administrative action is often categorized as either rulemaking or adjudicatory. *Blinzinger v. Americana Healthcare Corp.* (1984), Ind.App., 466 N.E.2d 1371. Rulemaking includes the process of formulating or adopting a rule. I.C. § 4–22–2–3 (Burns 1993). The challenged action here involves rulemaking as opposed to adjudication. Rulemaking is not subject to judicial review under the provisions of the Administrative Adjudication Act, I.C. § 4–22–1–1, *et seq. Indiana Environmental v. Indiana–Kentucky Elec.* (1979), 181 Ind. App. 570, 393 N.E.2d 213. However, rulemaking is not exempt from judicial review. *Gross Income Tax Div. v. Colpaert Realty Corp.* (1952), 231 Ind. 463, 109 N.E.2d 415, 422. Courts exercise a greater degree of self-restraint when reviewing agency rulemaking as the process may involve a generally applicable interpretation of the basic public purpose of the governing statute, and it is not desirable to unduly restrict the freedom of the agency to do that. A similar self-restraint is appropriate in adjudicatory reviews. *Indiana Department of Public Welfare v. Payne* (1993), Ind., 622 N.E.2d 461. The State does not defend these challenges on the basis that there was any failure to exhaust administrative remedies before entering court.

■■■ The state plan for Medicaid reimbursement to Providers is a complex agency rule resolving a major issue in society. The plan bridges the gap between broad congressional and legislative statements of purpose and individual recipients and providers. The rule has also been approved at various stages by the HCFA on behalf of the state-federal partnership. The scope of judicial review under state law is narrow and the agency's action will not be over-turned unless it is purely arbitrary or an error of law has been made. *Wallace v. Feehan* (1934), 206 Ind. 522, 190 N.E. 438; *Blue*, 155 Ind. 121, 56 N.E. 89; *City of Indianapolis v. Ingram* (1978), 176 Ind. App. 645, 377 N.E.2d 877. On appeal from the judgment of the trial court, its resolution of any factual issues will be sustained if supported by substantial evidence; however conclusions of law are reviewed for error. *Pendleton Banking Co. v. Dept. of Financial Inst.* (1971), 257 Ind. 363, 274 N.E.2d 705; *Ingram*, 176 Ind.App. 645, 377 N.E.2d 877.

■■■ Judicial review in state courts of this state plan includes consideration of whether it complies with federal law. *Arkansas Medical Society, Inc. v. Reynolds*, 6 F.3d 519, (8th Cir.1993). Federal standards governing judicial review of state Medicaid plans do not differ substantially from state standards. Since Providers here challenge the State's reimbursement system, they have the burden of demonstrating to the court that the rates received under the State's system were the product of an unreasonable interpretation of the statute, falling outside the zone of reasonableness. *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Lett v. Magnant*, 965 F.2d 251 (7th Cir.1992); *Wis. Hosp. Ass'n v. Reivitz*, 733 F.2d 1226, 1233 (7th Cir. 1984).

■■■ There are two separate parts to the federal Boren requirement, one procedural and the other substantive. When the issue is substantive compliance, a court must employ a more deferential standard of review. *Wilder*, 496 U.S. at 520 n. 18, 110 S.Ct. at 2523 n. 18, 110 L.Ed.2d at 473–74 n. 18. So long as an agency is exercising its discretion, courts must defer to the agency's expertise. *AMISUB (PSL), Inc. v. Colorado Dept. of Social Services*, 879 F.2d 789 (10th Cir.1989), *cert. denied*, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).

■■■ The *Community Care* litigation resulted in the entry of three summary judgments. On appeal, summary judgments, like all judgments, are clothed with

the presumption of validity. *Dep't of Revenue v. Caylor–Nickel Clinic* (1992), Ind., 587 N.E.2d 1311. The party appealing from the grant of summary judgment has the burden of persuading the appellate tribunal that the trial court erroneously determined that there is no material issue of fact and that the movant was entitled to summary judgment as a matter of law. *Jordan v. Deery* (1993), Ind., 609 N.E.2d 1104. The reviewing court faces the same issues that were before the trial court and follows the same process. *Id.* All properly asserted facts and reasonable inferences should be resolved against a moving party. *Cowe v. Forum Group, Inc.* (1991), Ind., 575 N.E.2d 630, 633. The judgment of the trial court will be affirmed on appeal if sustainable on any basis. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154.

The summary judgment motions granted by the *Community Care* trial court had been filed by Providers. While the State, as the appealing party, has the burden of persuasion, the essential issue for this Court remains whether the Provider as moving party has established the lack of material factual issue dispositive as a matter of law. Thus, the burden was upon Providers in the trial court to establish that there was no nexus between the costs of operating efficient and economical nursing facilities and the rates under the State's plan.

Effective in 1976, Congress required Medicaid payments to Providers to be calculated on the basis of a plan using

a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary

42 U.S.C. § 1396a(a)(13)(E) (Supp. III 1979). This has been referred to as the reasonable cost standard. The Indiana statute was amended to correspond with this standard. The statute required payments to be determined in accordance with

a [prospective] pre-negotiated payment rate predicated on a reasonable cost-related basis, with a growth or profit fac-

tor, as determined in accordance with generally accepted accounting principles and methods, and written standards and criteria, as established by the state department of public welfare.

I.C. § 12–1–7–17 (1976). Pursuant to these enactments, the State adopted its rule establishing a prospective, pre-negotiated system of payment predicated on reasonable cost. Under the rule, each year, every provider was entitled to have an individual rate set on a fact specific basis. The rule did not impose an actual cost cap, but of particular pertinence to this appeal, it did impose five caps on any annual rate increase, including the following three:

(I) Market Area Limitation. This ceiling is determined for each of the 6 classes, and is established as 135% of the average allowable (weighted as appropriate) for each class.

(II) Incentive Payment Limitation. Providers whose allowable costs are less than the Market Area Limitation of their class (as described in I) may retain 30% of the difference as an incentive factor for efficient operations, subject to application of limitations III, IV and V below.

(III) Annual rate increase limitation. The maximum allowable increase in a provider's average Medicaid rate will not be greater than nine percent (9%) of their previously approved rate per any twelve (12) month period beginning July 1, 1976, and adjusted pursuant to the directives of the State Department of Public Welfare. The maximum allowable increase will be calculated on one increase, or the aggregate of the two increases per year as provided herein.

470 IAC 5–4–5(2)(I)–(III) (1979). The above payment system, based upon the idea of reasonable costs, was approved by the Secretary of Health, Education and Welfare, and upon it Providers had their reimbursement payments calculated until the early 1980s.

In 1981 Congress substituted a new standard as part of the Boren Amendment to the Medicaid Act to govern the calculation of Medicaid payments due Providers. This

standard provides that payments must be set at a rate which is

> reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

42 U.S.C. § 1396a(a)(13)(A) (Supp. V 1981). This is the standard that was applicable to the process of determining the rates for payments due Providers in these cases.

Through this modification of the federal standard, Congress afforded states greater flexibility in calculating reimbursement rates. *Wilder*, 496 U.S. at 506, 110 S.Ct. at 2516, 110 L.Ed.2d at 465. In reflecting upon this change of course, one court has observed:

> Because of rapidly escalating Medicaid costs, Congress reevaluated this approach [reasonable cost] in the early 1980s. Congress eventually concluded that the complexity, rigidity and "inflationary nature" of the reasonable cost reimbursement system was to blame for the program's rising costs. Accordingly, Congress enacted Boren in 1981, replacing the reasonable cost provision with "a provision requiring States to reimburse hospitals at rates ... that are reasonable and adequate to meet the cost which must be incurred by efficiently and economically operated facilities...."
>
> . . . .
>
> The Boren Amendment was enacted with two specific purposes in mind: (1) to provide the states with greater flexibility in developing methods of reimbursing skilled nursing facilities, intermediate care facilities, and inpatient hospital services; and (2) to increase the economy and efficiency of all plans.
>
> . . . .
>
> Boren therefore creates a tension between the need to creatively cut costs and stimulate the efficiency of providers, and the obligation to provide adequate care to Medicaid patients.

*Dep't of Health and Social Servs. v. Alaska State Hosp. and Nursing Home Ass'n*, 856 P.2d 755, 758–759 (Alaska 1993) (citations omitted).

With the reduction of federal funds to be paid under the Medicaid program, the change in the federal standard enabled states to create reimbursement plans which would encourage cost containment in the health/medical field. *Reivitz*, 733 F.2d at 1228; *Medicaid Program* at 871.

Indiana responded to the Boren Amendment by amending its statute governing payment to Providers, abandoning the existing reasonable cost standard, and tracking the standard of the Boren Amendment. The Indiana statute provided:

> Payment ... shall, under 42 U.S.C. § 1396a(13)(A), be determined in accordance with a prospective, renegotiated payment rate that is reasonable and adequate to meet the costs that are incurred by efficiently and economically operated facilities in order to provide care and services in conformity with state and federal laws, rules, regulations, and quality and safety standards....

I.C. § 12–1–7–17.2 (Burns 1984). This Indiana statutory counterpart was applicable to the judgments considered in this appeal and is virtually identical to the Boren Amendment.

In 1983, the DPW also responded to Boren and the Indiana statutory amendment by amending the form of its prior rule. The newly-amended provision provided:

> The procedures delineated in 470 IAC 5–4.1 set forth methods of reimbursement that promote quality of care, efficiency, economy, and consistency.... The system of payment outlined in 470 IAC 5–4.1 is a prospective system predicated on a reasonable, cost-related basis. *However, cost limitations are contained in 470 IAC 5–4.1 which establish parameters regarding the allowability of costs. ...*

470 IAC 5–4.1–1(b) (1984) (emphasis added). The State also added the following:

> In determining reasonableness of costs, the department may compare major cost centers or total costs of similar providers

in the state and may request satisfactory documentation from providers whose cost does not appear to be reasonable. Similar providers are those with like level of care, size and geographic location.

470 IAC 5–4.1–10(d) (1984) (hereinafter referred to as "the tests of reasonableness").

In 1983, the State also modified the five caps upon annual rate increases. The three major caps from the pre-Boren Amendment rule were modified as follows:

The MAL [market area limitation] is an amount which shall be 140% of the average allowable cost, weighted by certified beds, for the same type of providers.... Providers whose allowable costs are less than the MAL ... may retain a percentage of the difference as an incentive factor for efficient operation.

470 IAC 5–4.1–9(c)(1) (1984).

The calculated rate is the sum of the allowed costs and the add-on incentive. The add-on incentive is a percentage of the difference between the MAL and allowable cost, if allowable cost is less than the MAL. The provider shall be paid at the calculated rate if such a rate does not exceed any of the other limitations outlined herein.

470 IAC 5–4.1–9(c)(2) (1984).

The maximum allowable annual rate increase for the twelve (12) months following April 1, 1983, shall not be greater than the average rate of change, expressed as a decimal, of the most recent twelve (12) quarters of the Gross National Product Implicit Price Deflator.

470 IAC 5–4.1–9(c)(3) (1984). The two features of the plan methodology to which Providers object in their 1988 and 1990 lawsuits were introduced into the plan in 1983, soon after the enactment of the federal Boren Amendment. The State tightened the annual rate increase limiter from 9% to the GNP/ipd or general rate of inflation in the economy as a whole, and introduced the tests of reasonableness, to be applied to the cost factor. 470 IAC 5–4.1–5 exempted the process of determining the initial and base rates of reimbursement for a provider from application of the GNP/ipd annual rate limiter.

In 1988, the state plan was amended and assumed the form in which it was applied to Providers in this appeal. The GNP/ipd annual rate limiter was retained in the plan undisturbed. The cost reasonableness language was changed to provide:

In determining reasonableness of costs, the department may compare line items, major cost centers or total costs of similar providers in the state and may request satisfactory documentation from providers whose cost does not appear to be reasonable. Similar providers are those with like level of care and geographic location.

470 IAC 5–4.1–10(d) (1988). Also in 1988, further details of the tests of reasonableness were set forth at 470 IAC 5–4.1–10(e).

At the core of the state plan, as applied to Providers in these cases, is the methodology for establishing an initial or base rate for a provider. Pursuant to the 1983 and 1988 Rules, such first or base rate is established upon a pre-Boren type reasonable cost standard, without application of the GNP/ipd limiter. Providers make no complaint about the methodology for setting this rate. The rate is applicable for twenty-two months after it is set. The rule permits a participating provider to thereafter request and, if adequate support for such request is given, to receive a rate increase once each year. Pursuant to the GNP/ipd limiter, such annual rate increases cannot exceed the general rate of inflation in the economy as a whole.

The details of the tests of reasonableness, as promulgated in 1988, provide for a three level approach to costs: 1) the first level is a general line item review wherein DPW reviews each budgeted item for a provider with the previous years data on that item; 2) the second level is a per diem comparison by cost centers; and 3) the third level is a per diem comparison between providers in the same geographic area. All providers are separated into one of three geographic areas. The second and third levels would be performed only on

providers that exceeded the 75th percentile of all homes in total per diem costs.

Under the plan, once the budgeted allowable costs are determined, a bonus incentive payment is added to it to determine the "calculated rate." The incentive payment is a percentage of the difference between budgeted allowable costs of the facility and 140% of the average budgeted allowable costs of similar facilities in the same geographic area. 470 IAC 5–9(c)(1) (1988). Once the calculated rate is determined, rate limiters are applied to determine the final rate for the upcoming year. The GNP/ipd is one such rate limiter.

The grievance in both *Tioga Pines* and *Community Care* is to be determined from an examination of the judgments themselves. The gravamen in each case is the same, namely: 1) the employment of the GNP/ipd annual rate limiter in the state plan methodology for calculating nursing home reimbursement for Medicaid services renders the plan violative of the requirements of the governing federal law and state law; and 2) there is no authority of the state to employ tests of reasonableness adopted in 1988 because such tests were not lawfully promulgated. The remedy afforded by the judgments in each case gives final delineation to the illegalities which are the bases of the judgment. In each case, the curative measure is the excision of an offending part of the state plan and an enforcement of the remaining part. With respect to the GNP/ipd annual rate limiter, the illegality upon which the judgment is based is clearly substantive.

## A. Tests of Reasonableness

■ Beginning in 1983, the State used the three-level tests of reasonableness. The State argued at trial that the nursing home industry was aware of the use of the tests in 1983, including the detailed steps, and it was the industry's preference that the detailed steps not be promulgated as rules at that time.

On June 28, 1988, the State Board of Public Welfare met to formally promulgate the details of the tests of reasonableness. The Board is a seven-member board, but only three members were physically present at the June 28, 1988 meeting. However, two members had given their written proxies to one of the members who was present. The Board's enabling statute stated, in part:

> There is created a state board of public welfare, which shall be appointed by the governor and consists of seven (7) members.... Four (4) members of the board constitute a quorum for the transaction of business....

I.C. § 12–1–15–2 (Burns 1988) (repealed 1992). The statute did not mention proxies and there was no agency rule mentioning proxies.

The *Tioga Pines* trial court found the use of the tests of reasonableness an illegal aspect of the Medicaid reimbursement regulation because it was never duly promulgated. Therefore, the court found it contributed to the Providers' under-reimbursement.

In ruling on a summary judgment motion filed by the Indiana Health Care Association, the *Community Care* trial court likewise found the use of the tests of reasonableness illegal, because they were never duly promulgated. The *Community Care* trial court concluded that no quorum was present at the Board meeting of June 28, 1988; thus, the rules were void. The trial court permanently enjoined the State from utilizing such rules.

In general a proxy is one who has the same authority to act and vote as does the member. As noted, the use of proxies is not contrary to the delegating statute in these appeals. Some Indiana statutes expressly sanction the use of proxies. I.C. § 3–6–4–6 (State Election Board); I.C. § 36–7–6.1–9 (Maumee River Basin Commission). Some statutes expressly forbid the use of proxies. I.C. § 13–2–27–5 (Rivers Commission Act); I.C. § 8–1–2.7–7 (Local Water Corporations). The statute applicable here sanctions rules "necessary or desirable" to carry out the delegated duties and not inconsistent with such duties. I.C. § 12–1–2–3 (Burns 1988).

This Board is composed of volunteer citizens from around the state and it is natural to suppose that difficulties would be met from time to time achieving a live quorum for the conduct of official business. This Board employed written proxies of record. This Board in promulgating this rule did not chart an entirely new administrative course. The record in this case establishes that this Board has applied the tests of reasonableness at least since 1983. Providers knew of the tests' existence, received payment under the system with application of the tests for at least five years prior to bringing suit, and did not initiate a challenge. Providers challenge only the procedural aspect of the tests' promulgation and make no claim against the substantive aspect of the tests. The promulgation of this amendment by this Board was subject to further federal consideration and oversight. Providers do not identify an impingement upon any special right or interest other than the interest in procedural compliance.

■■■■ Clearly there is a preference implicit in the very concept of official government action of live personal participation by public officials. At the same time, the choice of procedural methods by agencies, if not arbitrary or contrary to law is entitled to judicial deference upon review, particularly in the area of rulemaking. The departure here from the preference for live personal participation in official action by a quorum, is an irregularity, the harm of which (if existing) was healed by review rights and the further action at federal levels. Under these circumstances, it was error to invalidate the 1988 promulgation. Providers are not entitled to injunctive relief.

## B. GNP/ipd

■■■■ Providers presented evidence to the *Tioga Pines* trial court regarding the GNP/ipd maximum annual rate limiter. This evidence can be summarized as follows:

Rosacker, CPA, testified that 91.14% of facilities to which the GNP/ipd was applied in 1989, and 88.79% in 1990 had their rates limited by the GNP/ipd.

Deane, economist, testified that the GNP/ipd is not an appropriate index of cost for the nursing home industry, because it does not relate to the nursing home industry, does not address itself to the geographic area or time period in question, and is a price index and not a cost index. Deane stated the GNP/ipd was the best measure of inflation of all goods and services produced in the economy.

Blinzinger, former DPW Administrator, testified that DPW had initially recommended the medical component of the Consumer Price Index as the index to determine the maximum annual increase, but that index was rejected by the Governor in favor of the GNP/ipd as recommended by the State Budget Agency. Blinzinger further testified that the nursing home industry was "intimately and comprehensively" involved in the development of the new criteria in 1982–83, and agreed that an annual limiter was a requirement. Blinzinger stated that although the industry actively made their views known to him between April 1983 and early 1987, he did not receive any complaints about the use of the GNP/ipd or the overall level of reimbursement.

Jazwiecki, CPA, testified that the GNP/ipd loses its relevancy to the actual costs incurred by the providers, because it has no relationship to the costs incurred during that time period. His testimony is that because the GNP/ipd has no relationship to actual costs incurred, the gap between rates paid and costs incurred increases. Jazwiecki testified that in 1987, 41.2% of facilities did not receive rates which covered their "actual allowable costs" and by 1990, 70.6% of facilities did not.

Johnson, nurse and college professor, testified that in her experience the trend is that nursing home residents are "sicker and more dependent." Although she conceded that she had not studied Indiana nursing homes in particular, she believed Indiana would be "no different than anyplace else" in this regard. She also testified that "a large number of facilities" in

Indiana had difficulty meeting quality of care standards between 1987 and 1990.

Buoy, CPA, testified that there are two ways for an existing facility to escape application of the GNP/ipd: 1) change of ownership, which includes selling or leasing facilities; and 2) capital expenditures, which results in adjustment of the GNP/ipd under certain circumstances. Buoy testified that of the 249 transactions since 1987, the majority (177) have involved leasing of facilities instead of outright selling of facilities. Buoy further testified that between 1985 and 1990, the GNP/ipd increased between 2.8 and 3.8% annually.

Engquist, management consultant, testified that a flaw in the cost containment system in Indiana is the serious problem with changes of ownership. Engquist further testified that the GNP/ipd was an appropriate limiter for achieving the objectives of a prospective payment system.

Other courts have ruled upon the question of whether a state plan satisfies Boren Amendment substantive standards. In *Ohio Hosp. Ass'n v. Ohio Dept. of Human Services*, 62 Ohio St.3d 97, 579 N.E.2d 695 (1991), a state plan amendment reducing a reimbursement rate to 88% of reasonable costs was held violative of the Boren Amendment and state law, because it was implemented solely for budgetary reasons, without consideration of its effect on the quality of care. A U.S. district court of appeals invalidated a plan where the state used a "budget adjustment factor" to divide its median cost of care in half. *AMISUB*, 879 F.2d 789. A federal district court enjoined Illinois from deferring 23.5 percent of the amount calculated pursuant to its final hospital reimbursement rate, because the plan failed to satisfy the federal requirement that Medicaid reimbursement rates be sufficient to ensure quality care. *Illinois Hosp. Ass'n v. Illinois Dep't of Pub. Aid*, 576 F.Supp. 360 (N.D.Ill.1983). Another district court preliminarily enjoined a plan that limited current year reimbursement to previous year allowable costs, plus 1% for inflation. *Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehab. Servs.*, 822 F.Supp. 687 (D.Kan.1993).

Providers persuaded the trial courts that the GNP/ipd was unrelated to nursing home care, and was essentially and impermissibly budget-driven. Providers argued that the GNP/ipd was chosen by the State Budget Agency to effectively set the reimbursement rate at 90% of the class. The *Tioga Pines* trial court found the use of the GNP/ipd maximum annual rate limiter was an illegal aspect of the Medicaid reimbursement regulation because Providers were under-reimbursed for their reasonable costs.

The *Community Care* trial court also found the State's reimbursement rate inadequate under the state statute.[4] This determination was based on evidence similar to that in *Tioga Pines* relating to the use of the GNP/ipd. The *Community Care* trial court specifically found that the GNP/ipd was the sole determinant in arriving at a provider's rate. The trial court found this impermissible, and enjoined the State from using the GNP/ipd as the sole determinant.

These two cases fall outside the perimeters of the above cases that have found substantive Boren Amendment violation. There was a percentage annual rate increase limiter atop the Indiana plan before the Boren Amendment. The Boren Amendment standard encourages the State to sharpen its focus upon industry behavior and take steps to encourage more efficient and economical operation within that industry. It encouraged change. The State chose to decrease its longstanding annual rate limiter from 9% to the general rate of inflation, that is between 2.8% and 3.8% during the time applicable here, such limiter to be applied to a cost-driven initial or base rate. The changed plan received federal approval and was applied to the industry for five years before it was challenged in court. The rate increase permitted by the GNP/ipd is greater than the 1% cap

---

4. At the time *Community Care* was litigated in the trial court, Indiana's counterpart to the Boren Amendment was set forth at I.C. § 12–1–7–17.2 (Burns 1988). In 1990, I.C. § 12–1–7–17.2 was repealed and the language re-codified at I.C. § 12–1–7–17.6.

condemned in the *Kansas Health Care* case above. Unlike the other cases noted, annual increases in Indiana using prior year rates, including the cost-driven initial rate, and consistent with the general rate of inflation, continued to be available. To condemn Indiana's reimbursement system for nursing homes on this basis would be to eviscerate the purpose and intent of Boren and the purpose of Indiana's statute. To do so would merely collapse "the post-Boren language into the pre-Boren reasonable cost standard." *Lett*, 965 F.2d at 256.

The trial court was in error in concluding that the Providers established that there was no nexus between the costs of operating efficient and economical nursing facilities and rates under the State's plan with the GNP/ipd. Likewise, Providers failed to establish that the DPW's rulemaking was outside the confines of its duly delegated authority, or that the administrative action was arbitrary and capricious.

### C. Damages

As discussed above, the State's use of the GNP/ipd as a maximum annual rate increase limiter and the tests of reasonableness were not improper. In light of the holding of this Court that illegality in the State's reimbursement methodology was not established, there can be no award of damages, equitable reimbursement or retroactive monetary award. Because we determine that the State's methodology was not illegal, we need not address whether the trial court had jurisdiction to award damages or whether the trial court used an erroneous measure of damages.

### D. Attorney Fees

■ In addition to awarding damages to Providers, the *Tioga Pines* trial court also awarded attorney fees to class counsel and counsel for the intervenors (Cross-appellants). Class counsel was awarded $533,000.00 in fees and $32,000.00 for expenses, pursuant to 42 U.S.C. § 1988. Class counsel was also awarded 25% of the fund created by the judgment or $10,075,079.25 and $53,279.80 for expenses, pursuant to T.R. 23(D). Counsel for intervenors was awarded $548,361.00 in fees and $119,546.17 in expenses, pursuant to § 1988.

### 1. 42 U.S.C. § 1988

Section 1988 provides, in pertinent part:

In any action or proceeding to enforce a provision of [section 1983] ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The State argues the trial court's award of fees and expenses pursuant to § 1988 is erroneous, because Providers were not "prevailing parties" on any § 1983 claims. Providers rely on *Hewitt v. Helms*, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), as support for their argument that for purposes of § 1988, a party may prevail by voluntary action of a defendant. In this case, Providers argue they prevailed on their § 1983 claims, because the State voluntarily promulgated new rules in 1991.

■ Generally, in order to obtain an award of attorney fees, plaintiffs must prevail on the merits of their claims. *See Kentucky v. Graham*, 473 U.S. 159, 163, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114, 120 (1985). However, plaintiffs may be considered prevailing parties without obtaining a favorable final judgment following a full trial on the merits. Plaintiffs may prevail, for example, by consent decree or settlement which grants them the relief sought in bringing suit. *See, e.g., Hanrahan v. Hampton*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980).

The United States Supreme Court recently has addressed the issue of what constitutes a "prevailing party" for purposes of § 1988. In *Farrar v. Hobby*, 506 U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494, —— (1992), Justice Thomas, writing for the majority, stated:

[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settle-

ment. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affec(t) the behavior of the defendant toward the plaintiff. Only under these circumstances can civil rights litigation effect "the material alteration of the legal relationship of the parties" and thereby transform the plaintiff into a prevailing party.

*Id.* at ——, 113 S.Ct. at 572 (citations omitted).

As we have decided that Providers have failed to show a violation of the Boren Amendment, Providers have not prevailed by obtaining an "enforceable judgment." Further, there being no consent decree or settlement entered in this case, Providers have not established entitlement to "prevailing party" status with a resulting award of attorney fees pursuant to § 1988.

### 2. Trial Rule 23(D)

T.R. 23(D) provides in pertinent part:

The court shall allow reasonable attorney's fees and reasonable expenses incurred from a fund recovered for the benefit of a class....

The State and intervenors argue the trial court's award of 25% of the fund (approximately $30,000,000.00) to class counsel is an abuse of discretion. They contend the trial court erred in failing to use the lodestar method of calculating the award.

For the same reasons that we determined Providers were not prevailing parties entitled to § 1988 damages, we also determine the award of fees and expenses pursuant to T.R. 23(D) is erroneous. We do not address whether the trial court's award was otherwise erroneous.

### E. Conclusions

The *Tioga Pines* judgment of the trial court entitled "Partial Final Judgment Entry," dated March 25, 1992, which awarded damages to the providers for under-reimbursement for the period January 24, 1988 through March 31, 1991, is reversed with instructions to grant judgment for the defendants. The further judgment of the trial court that providers recover attorney fees and expenses pursuant to 42 U.S.C. § 1988 is reversed, there being no right to attorney fees under that provision. The further judgment of the *Tioga Pines* trial court that class counsel recover 25% of the fund created pursuant to T.R. 23(D) or $10,075,079.25 is perforce reversed, there being no right to recover from such fund.

With respect to the judgment of the Blackford Circuit Court regarding the "Order on Motion for Partial Summary Judgment Filed by Indiana Health Care Association" of May 17, 1990, which enjoined the use of the tests of reasonableness because of a lack of legal promulgation, the judgment is reversed with instructions to grant partial summary judgment to defendants.

The January 15, 1991 "Order Granting Partial Summary Judgment to Plaintiff" of the *Community Care* trial court, which enjoins the use of the GNP/ipd as the sole determinant in setting Medicaid rates, is contrary to law and is reversed with instructions to grant summary judgment to defendants.

As for the December 16, 1991 "Order Granting Summary Judgment" filed by the *Community Care* trial court, this order was a declaratory judgment finding the State lacked promulgated authority to make line item comparisons and comparisons among providers without regard to size. This conclusion was based on a finding that LSA 88–33 was void as improperly promulgated. Because of our conclusion that LSA 88–33 is not void, this order must also be reversed with instructions to grant summary judgment for defendants.

Due to the final decisions in this appeal, no consideration of cross-errors need be given.

SHEPARD, C.J., and GIVAN, DICKSON and KRAHULIK, JJ., concur.