RES–CARE, INC., Community Alternatives Indiana, Inc., Normal Life of Sheridan, Inc., and Jane Doe, acting through her guardian, Appellants–Plaintiffs,

v.

INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION and James M. Verdier, Appellees–Defendants.

No. 18A02–9804–CV–338.

Court of Appeals of Indiana.

Nov. 25, 1998.

Gregory A. Huffman, DeFur, Voran, Hanley, Radcliff & Reed, Muncie, William P. Tedards, Jr., Washington, D.C., for Appellants–Plaintiffs.

Jeffrey A. Modisett, Attorney General, Jon Laramore, Deputy Attorney General, Indianapolis, S. William Livingston, Jr., Robert D. Wick, Covington & Burling, Washington, D.C., for Appellees–Defendants.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Res–Care, Inc., Community Alternatives Indiana, Inc., Normal Life of Sheridan, Inc., and Jane Doe ("Plaintiffs") appeal the trial court's determination that a certain rule for Medicaid reimbursement promulgated by the Indiana Family and Social Services Administration and James M. Verdier [1] (collectively, "the Agency") was not arbitrary and capricious. We affirm.

### ISSUE

Whether the rule was arbitrary and capricious because

(1) three facilities were excluded from the cost base when calculating the median cost for intermediate care facilities for the mentally retarded (ICFs/MR) for the rate effective on July 1, 1994; or

(2) State operated ICFs/MR were excluded from the cost base in calculating the median cost for privately operated ICFs/MR.

### FACTS [2]

The Medicaid program is jointly funded by the State and Federal governments and provides health care services to the poor. *See Indiana Bd. of Public Welfare v. Tioga Pines*, 622 N.E.2d 935, 938 (Ind.1993), *cert. denied* 510 U.S. 1195, 114 S.Ct. 1302, 127 L.Ed.2d 654 (1994). Pursuant to federal law, each state must develop and submit for federal approval a State Medicaid Plan that specifies the reimbursement methodology that will be used to pay health care providers. *See Indiana State Dep't of Public Welfare v. Lifelines Ltd. Partnership*, 637 N.E.2d 1349, 1351 (Ind.Ct.App.1994). The states are given great latitude to design their own reimbursement methodologies but are also directed to adopt reimbursement systems that will encourage providers to operate efficiently. *Id.* at 1351. States must pay Medicaid providers in accord with the terms of their approved state plans in order to receive the federal Medicaid funds. (R. 2190–92).

In the early 1990's, Indiana's costs per Medicaid recipient were among the highest in the nation, and costs were rising at a rapid rate. Medicaid expenditures rose approximately 20 percent a year between 1989 and 1993, while State revenues grew at only 3 or 4 percent a year. Privately owned ICFs/MR (intermediate care facilities for the mentally retarded) were implicated in this trend, in that from 1990 to 1992 annual Medicaid payments to those facilities doubled from $17 million to $34 million despite the fact that the number of residents in those facilities increased by only 40 percent. As a result of the rate of increase in Medicaid expenditures, Indiana's Governor requested that the Agency undertake a review of the reimbursement systems applicable to various categories of Medicaid providers and undertake reimbursement reform toward the ends of

- cover[ing] the full Medicaid costs of efficiently and economically operated facilities;
- provid[ing] improved incentives for efficient and economical operation;
- simplify[ing] the current overly complicated system;
- reduc[ing] the current wide disparity in rates among facilities providing essentially the same type and level of care; and
- assur[ing] that reimbursement is sufficient for efficiently and economically

---

1. As Assistant Secretary for Medicaid Policy and Planning and the director of its Office of Medicaid Policy and Planning, Verdier was responsible for developing administrative rules and regulations governing reimbursement of Medicaid service providers.

2. Plaintiffs' "Statement of the Case" only incidentally mentions that there was a "legal action" filed and a trial took place; it fails to enlighten us as to the nature of the proceedings as indicated by Ind. Appellate Rule 8.3(A). Unfortunately, Plaintiffs' "Statement of the Facts" is equally unhelpful. A series of twenty-seven facts presented without any elucidation as to their context—when the record consists of sixteen volumes and covers ten days of testimony—also falls far short of that which assists this court in reviewing an appellant's claims. We also remind Plaintiffs that Ind. Appellate Rule 8.2(A)(1) requires a table of authorities.

operated facilities to provide care and services in conformity with federal and state quality and safety standards.

(R. 3314).

The existing ICF/MR reimbursement rule, Rule 4.1, was found to be an important cause of the soaring Medicaid costs for those facilities because it failed to give providers real incentives to operate efficiently and contained a number of features that resulted in over-reimbursement of providers. Consequently, the State was paying ICFs/MR as much as 140 percent of their Medicaid costs under that rule. On December 1, 1993, the Agency proposed new reimbursement rules for ICFs/MR. Extensive discussions with providers and their representatives followed, as did a public hearing.

On April 1, 1994, a revised proposed rule—which was to become Rule 12—was published in the Indiana Register. The April 1 proposal incorporated a number of suggestions from ICFs/MR and their representatives, and was more favorable to them than the original proposal. After an additional round of notice and comment proceedings, Rule 12 was adopted by the Agency, and approved by the Attorney General, the Secretary of State, and the Governor. The final rule was published on July 1, 1994. Rule 12 was then submitted to the federal Health Care Financing Administration for review, and was approved thereby.

Rule 12 contains an overall rate limit pegged to the median costs in the industry. The rate limit would cap reimbursement rates at 107 percent of the median allowable costs incurred by Indiana ICFs/MR. However, in order to give providers time to adjust to the new median-based rate limit, the limit was phased in gradually. Beginning on July 1, 1994, facility rates were limited to 140 percent of median allowable costs in the industry. The rate limit then declined to 130 percent of the industry median effective on April 1, 1995, to 125 percent of the median effective on October 1, 1995, and to 107 percent effective on April 1, 1996. Under Rule 12, each ICF/MR is paid a rate based on the inflation-indexed costs the facility actually incurred in the prior rate period, plus a capital return factor that includes a profit. An additional profit add-on is paid to providers who keep their costs below 125 percent of the median costs of providers. A facility's rate is re-calculated each year to take into account new cost and inflation data.

On about April 12, 1995, Res–Care received from the Agency's rate-setter the calculation of the July 1, 1994, median as well as its own rates effective July 1st. It then learned its three CAIN facilities [3] were not included in calculating the median. On September 12, 1995, Res–Care, CAIN, Normal Life of Sheridan, Inc. (another ICF/MR facility), and Jane Doe (a resident in a Res–Care ICF/MR facility), acting through her guardian, filed a complaint for preliminary and permanent injunction. Plaintiffs alleged that Rule 12 was

arbitrary and capricious in the following particulars:

a. the exclusion of the three CAIN facilities from the cost base when calculating the median cost for ICFs/MR for the rate effective on July 1, 1994; b. the use of "allowable costs" as opposed to actual costs in calculating reimbursement rates for ICFs/MR;

c. the limitation for purposes of computing "allowable costs" of staffing costs for direct patient care for ICFs/MR to seven hours per patient day;

d. the reduction of the overall reimbursement rate limit for ICFs/MR from 125% of the median as originally proposed to 107% of the median as provided for in Rule 12 as finally promulgated; and

e. the exclusion of the State operated ICFs/MR from the cost base in calculating the median cost for privately operated ICFs/MR.

(R. 221). Plaintiffs sought an injunction to prevent the Agency from applying Rule 12 to their ICFs/MR. The trial court heard evidence over the course of three days and on April 29, 1996, denied Plaintiffs a preliminary

---

**3.** Res–Care operates five large ICFs/MR in Indiana. Three of these are operated through its subsidiary CAIN.

injunction. At the trial on the merits, the trial court made the preliminary injunction hearing evidence of record and then heard an additional seven days of evidence. On September 29, 1997, the trial court issued extensive findings of fact. Its conclusions of law and judgment denied relief to Plaintiffs except as to a narrow matter concerning allowable costs for staffing (issue "c." above). Plaintiffs appeal with respect to two of the five claims that they presented to the trial court.

## DECISION

As our Supreme Court observed in *Tioga Pines*, a state plan for Medicaid reimbursement to providers is a complex agency rule resolving a major issue in society. 622 N.E.2d at 939. In judicial review of rulemaking, courts exercise restraint because "the process may involve a generally applicable interpretation of the basic public purpose of the governing statute, and it is not desirable to unduly restrict the freedom of the agency to do that." *Id.* After the rule setting out the reimbursement has been properly promulgated and approved by the Health Care Financing Administration, the scope of judicial review "is narrow and the agency's action will not be overturned unless it is purely arbitrary or an error of law has been made." *Id.* The agency's action is arbitrary or capricious only where there is no reasonable basis for the action. *Indiana Civil Rights Comm'n v. Delaware County Circuit Court*, 668 N.E.2d 1219, 1221 (Ind.1996). The judgment of the trial court in resolving any factual issues will be sustained if supported by substantial evidence; however, its conclusions of law are reviewed for error. *Tioga Pines*, 622 N.E.2d at 939.

1. *Exclusion of Three Res–Care Facilities in Initial Median Calculation*

During the transition to Rule 12, new Medicaid rates had to be calculated for the fourteen private ICFs/MR and the more than five hundred small group homes also governed by the rule. Rule 12 contained a specific provision (Sec. 4(b)) setting a data cutoff date in order to facilitate the timely calculation of rates during this transition. The provision specified that the first median

calculated under Rule 12 would be calculated only from cost reports submitted in connection with rate reviews completed by July 1, 1994, the effective date of the Rule. A rate review consists of a thorough review of a facility's cost reports and the calculation of a rate for that facility. Completion of the rate review process generally takes considerably longer than a month.

The State's rate-setting contractor calculated the initial median for ICFs/MR based on submitted data upon which rate reviews had been completed by July 1, 1994, consistent with the Rule. This calculation did not include the costs report for three facilities operated by Res–Care through its subsidiary CAIN. The cost reports for these facilities for the required period ending March 31, 1994, were not mailed by Res–Care until May 31, 1994 (the final possible day under the applicable regulation). The rate setting review of the CAIN cost reports was not completed by July 1, 1994. Therefore, consistent with the cutoff provision, the data for the CAIN facilities were not included by the rate-setter when it calculated the initial ICF/MR median.

The trial court found the following facts:

22. The phrase "average inflated allowable cost of the median patient day" is defined in Rule 12 as being the inflated allowable patient day cost of the median patient day from all providers when ranked in numerical order based on average inflated allowable cost. 405 IAC 1–12–2(e). Section 4(b) of Rule 12 provides that the inflated allowable cost of the median patient day used to calculate the initial rates would be established on the effective date of the Rule, and would be based on the data submitted by providers for rate reviews that were completed as of the effective date of the Rule and had a rate effective date prior to the effective date of the Rule—July 1, 1994. 405 IAC 1–12–26–4(b).

23. In February of 1994, the rate-setter for the Defendants, during the period of discussion with representatives for the ICFs/MR and the trade association for the ICFs/MR leading up to the promulgation

of Rule 12, published a projected initial median for the ICFs/MR of $121.62. Exhibit 40.

24. The projected initial median published by the rate-setter for the Defendants included the cost information for all ICFs/MR which was included in the rate-setters data base as of the date the projected initial median was generated. The projected initial median included cost information from Beverly Enterprises, Inc. (which was the proprietor of the CAIN facilities prior to their acquisition by Res–Care).

25. The Beverly cost reports were not included when calculating the initial median under Rule 12, as Beverly was no longer a provider, and Rule 12 requires that only cost reports from current providers were to be used in calculating the initial median. May Tr. at 631 (Buoy). In addition, pursuant to the requirements of Sec. 4(b) of Rule 12, the Res–Care cost reports for the CAIN facilities were not included when calculating the initial median because those cost reports had not been processed as of the July 1, 1994 deadline. *Id.* at 626 (Buoy). Notwithstanding the Plaintiffs' contention to the contrary, no credible evidence was presented that the [Agency] or [its] rate-setter deliberately delayed completing the analysis of the CAIN cost reports in order to keep those cost reports out of the median calculation or attempted, in any way, to manipulate the initial median. *Id.* at 460 (Verdier), 626–27 (Buoy). Res-care did not submit the CAIN cost reports for review by the rate-setter until about May 25, 1994, and the initial reimbursement rate for those facilities was not established by the rate-setter for FSSA until November 1994. Exhibit 33.

26. Inclusion of the Beverly or CAIN cost reports in the calculation of the initial median effective on July 1, 1994 would have been a violation of Sec. 4(b) of Rule 12.

27. Subsequent median calculations have included cost reports for the CAIN ICFs/MR submitted in accordance with Rule 12. May Tr. 15 227–28 (Slattery).

(R. 222). Accordingly, the trial court concluded as a matter of law as follows:

4. It was reasonable for the [Agency] to promulgate a procedure for establishing the initial median cost under Rule 12. It has not been shown that [the Agency] acted unreasonably in requiring that the calculation of the initial median to go into effect on July 1, 1994 be based on the cost data submitted by current providers for rate reviews that were completed as of the effective date of the Rule and had a rate effective date prior to the effective date of the Rule. While it was unfortunate that the projections published in February of 1994 by the rate-setting contractor for [the Agency] included cost data which was not ultimately included in the computation of the initial median cost resulting [in] a projected initial median of approximately $13.00 per patient day more than the actual initial median cost computed under Rule 12, the initial median cost was computed by the rate-setter for [the Agency] in accordance with Rule 12 and the Plaintiffs have presented no credible evidence that the deviation from the median cost projection published in February, 1994 and the initial cost median actually implemented was the result of any manipulation of the process by [the Agency] or its rate-setting contractor. The exclusion of the cost data for certain providers in calculating the initial median cost for July 1, 1994 did not constitute arbitrary and capricious action on the part of the Defendants.

(R. 226).

Plaintiffs first argue that Rule 12 failed to comport with the requirement of "ascertainable standards which are well stated and followed," citing *Community Care Centers, Inc. v. Indiana Dep't of Public Welfare,* 523 N.E.2d 448, 450 (Ind.Ct.App.1988), because the Rule refers to calculating the median based on "all providers" yet the initial median was calculated without data from three CAIN facilities. As found by the trial court, the Rule specified a cutoff provision with respect to data included in the *initial* median's calculation, and the CAIN reports were not included because they had not been processed within the time thereby provided.

This is a reasonable basis for the Agency's having excluded the data. *See Civil Rights Comm'n.*

Plaintiffs also argue (without reference to authority) that the exclusion renders the Rule arbitrary and capricious because an earlier Agency projection had included data from the CAIN predecessor, and, therefore, a calculation which did not include this same data is *per se* arbitrary. As the trial court found, inclusion of this data in the Agency's calculation of the initial median would have violated the Rule. Consequently, this is a reasonable basis for the Agency's not including the data. *Id.*

Plaintiffs next argue that the Rule violates the "reasonable and honest" standard of *Bailey Seed Farms v. Board of Tax Comm'rs,* 542 N.E.2d 1389, 1391–92 (Ind. Tax Ct.1989). *Bailey* declared that in judicial review of an agency determination under the arbitrary or capricious standard, "an act is arbitrary or capricious when it is without some basis which would lead a reasonable and honest person to the same conclusion as the agency." *Id.* at 1391. The Agency's exclusion of the CAIN data, and simultaneous omission of data from the CAIN predecessor, *did* have a basis which would lead a reasonable and honest person to the same result, in that the former had not yet been processed by the cutoff date, and inclusion of the latter would violate the Rule. *Id.*

Finally, Plaintiffs contend the only "possible explanation" for the omission of the CAIN facilities from the initial median calculation is the Agency's having "arbitrarily revis[ed] and manipulat[ed] basic features of the ICF/MR rate-setting formula in order to take money they needed from a very small group of providers whom they obviously felt they could simply overpower." *Id.* at 22. They fail to cite to the record in this regard, and the trial court found no evidence that "the initial cost median actually implemented was the result of any manipulation of the process by [the Agency] or its rate-setting contractor." (R. 226). That factual conclusion of the trial court is supported by the record. *See Tioga Pines.* Moreover, as already discussed, the explanation for the

omission rested upon a reasonable basis. *See Civil Rights Comm'n.*

### 2. *Exclusion of State Operated ICFs/MR from Calculation of Median*

 The median rate calculation performed by the rate-setter also did not include cost data for the ICF/MR facilities operated by the State.[4]

The trial court found as follows:

47. The State owned facilities providing comparable services to the large privately operated ICFs/MR were excluded from the calculation [of] the industry's weighted median. The rationale of the [Agency] in excluding the State owned facilities from this calculation was based on [the Agency's] assessment that the costs to operate State owned facilities was not comparable to the cost of large private ICFs/MR providing similar services because: (a) State owned facilities generally had older and larger buildings than private facilities, Feb. Tr. at 719–20 (Verdier); (b) State owned facilities were subject to State procurement and civil service procedures that private facilities are not, and therefore the State owned facilities have less flexibility in purchasing and hiring and firing staff; *Id.;* and (c) State owned facilities were not subject to the profit-loss discipline that operates in the private sector. *Id.*

(R. 225). The court then concluded:

8. It has been held by the Eight Circuit Court of Appeals that State owned facilities are not similarly situated to private facilities, and therefore their Medicaid reimbursement can be under a different methodology than private facilities. *Ass'n of Residential Resources v. Gomez,* 51 F.3d 137 (8th Cir.1995). The Defendants have delineated several factors distinguishing the State owned facilities providing services to the mentally retarded and the ICFs/MR providing similar services in the private sector. As a consequence, the Court does not find the Defendants have acted arbitrarily or capriciously in excluding the cost reports of the State owned

---

4. There are four such facilities.

facilities in computing the median "allowable costs" for the privately operated ICFs/MR.

(R. 228).

The factual conclusions of the trial court are supported by the record. *See Tioga Pines.* These "distinguishing factors" provided a reasonable basis for the State's action in excluding costs at State facilities, *see Indiana Civil Rights Comm'n,* warranting the trial court's legal conclusion that the State had not "acted arbitrarily or capriciously in excluding the cost reports of the State owned facilities." (R. 228).[5]

We affirm.

BAKER and BAILEY, JJ., concur.

---

**5.** As indicated at oral argument, held in Indianapolis on October 28, 1998, Plaintiffs' argument that the greater staffing at State facilities mandates the inclusion of their costs in an "honest determination of what costs are really necessary," Plaintiffs' Brief at 25, is a policy argument appropriately directed to the legislature.