ROBERTSON, Judge.
 

 The Indiana State Department of Public Welfare appeals following judicial review of an initial interim Medicaid rate determination made by the State Board of Public Welfare at the request of Lifelines of Indianapolis Limited Partnership (Lifelines) for the period January, 1988, through September, 1988. The Department of Public Welfare determined that Lifelines would be prospectively reimbursed for that initial period at a rate of $66.16 per patient per day. Aggrieved by that decision, Lifelines appealed and, after hearing evidence, an administrative law judge agreed with Lifelines that it was not receiving a level of reimbursement which complied with federal and state statutory standards. The State Board of Public Welfare rejected the ALJ’s recommendation and reinstated the original rate. On Lifelines’ petition for judicial review, the Hamilton Circuit Court found the Board’s decision
 
 *1347
 
 and certain of its “implicit” findings to be arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and unsupported by substantial evidence, and set the Board’s decision aside. We now reverse.
 

 The Medicaid program is the principle payor of nursing home care in the United States.
 
 Folden v. Washington State Department of Social & Health Services
 
 (W.D.Wash.1990), 744 F.Supp. 1507,
 
 1513, affirmed,
 
 981 F.2d 1054. Designed by Congress to enable participating states to obtain federal financial assistance in caring for the medical needs of the states’ needy, the program is voluntary. But, once a state chooses to participate, it must comply with all federal Medicaid laws and regulations.
 
 Lett v. Magnant
 
 (7th Cir.1992), 965 F.2d 251, 252. To qualify for assistance, a state must devise a scheme for reimbursing health care providers and have that plan approved by the Secretary of Health & Human Services. Presently, the state plan must comply with Section 1902(a)(13) of the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A) as amended by the Omnibus Budget Reconciliation Act of 1980, Pub.L. 96-499, § 962(a), 94 Stat. 2650 (1980), the revision now commonly referred to as the Boren Amendment.
 

 At its inception, the Medicaid Act was not specific in its regulation of allowable costs. However, in 1972, Congress moved to a standard used by the Medicare program which required payment on a reasonable cost-related basis. As a practical matter, the “reasonable cost” reimbursement method meant that the state paid for virtually all of the care provided Medicaid recipients.
 
 Mary Washington Hospital v. Fisher
 
 (E.D.Va.1985), 635 F.Supp. 891, 893. The states paid the actual costs incurred in providing care to Medicaid recipients, regardless of disparities in costs or inefficiencies among recipient providers.
 
 See Temple University v. White
 
 (3d Cir. 1991), 941 F.2d 201, 207,
 
 cert. denied,
 
 — U.S. -, 112 S.Ct. 873, 116 L.Ed.2d 778.
 

 Under the previous standard, a state’s plan was subject to review by the Health Care Financing Administration (HCFA).
 
 Indiana Board of Public Welfare v. Tioga Pines
 
 (1993), Ind., 622 N.E.2d 935, 938,
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1302, 127 L.Ed.2d 654. The Secretary’s review focused on the State’s payment method and standards, rather than on the rates paid to facilities, to determine whether the plan would result in a reasonable cost-related payment. Initial interim rule with comment period, 46 Fed.Reg. 47964, 47965 (1981). The Secretary assessed the appropriateness of each element of a state’s system, e.g. the State’s definition of allowable costs; its method of cost-finding; the State’s system of classifying facilities into comparison groups for rate-setting purposes and its specific methods for relating payment rates to facilities’ costs and for adjusting these rates for inflation.
 
 Id.
 
 Then, the Secretary would consider the appropriateness of these elements as they related to one another. This phase of review was crucial since an element of a payment system that would not meet the reasonable cost-related test when judged in isolation might be acceptable if it were compensated for by other elements of the system such that the system as a whole would result in a reasonable cost-related payment.
 
 Id.
 

 Congress found the Medicare reasonable cost reimbursement principles to be inherently inflationary and to contain no incentives for efficient performance. 46 Fed.Reg. at 47966. Other provisions of OBRA strongly encouraged states to contain costs within fixed limits or suffer substantial financial penalties in the form of reduced federal contribution.
 
 Mary Washington,
 
 635 F.Supp. at 894. Hence, the shift to more flexible reimbursement standards brought by the Boren Amendment had as its primary purpose the containment of cost.
 
 Lett,
 
 965 F.2d at 256.
 

 The Boren Amendment requires that a state plan provide for
 

 payment ... of ... nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws,
 
 *1348
 
 regulations, and quality and safety standards ...
 

 42
 
 U.S.G. §
 
 1396a(a)(13)(A).
 
 [1]
 

 Under the amendment, states are permitted to adopt prospective reimbursement methodologies; instead of reimbursing health care providers for the actual cost of services already provided, a state can pay providers in advance for care based on the state’s formula for what such services should cost,
 
 Illinois Health Care Association v. Bradley
 
 (7th Cir.1992), 983 F.2d 1460, 1462, and force providers to absorb the loss if their actual costs exceed that rate.
 
 Mary Washington,
 
 635 F.Supp. at 894. Participating states are not required to make individual cost determinations for skilled nursing facilities and are free to establish rates on a state-wide or other geographic basis, on an institution by institution basis, 46 Fed.Reg. at 47966, or by formulating class-wide reimbursement regulations based on costs of rational groupings of provider facilities,
 
 Friedman v. Perales
 
 (S.D.N.Y.1987), 668 F.Supp. 216, 222,
 
 affirmed,
 
 841 F.2d 47, without regard to Medicare reimbursement principles. 46 Fed.Reg. at 47966;
 
 Thomas v. Johnston
 
 (W.D.Tex. 1983), 557 F.Supp. 879. Moreover, the drafters of the amendment contemplated that the rates fixed in compliance with its provisions might not be sufficient to keep
 
 every
 
 facility participating in the program.
 
 Lett,
 
 965 F.2d at 257. Hence, the State’s inadequate reimbursement of one efficient and economically operated facility does not necessarily constitute a Boren Amendment violation.
 
 Id.
 
 at 256.
 

 In short, Congress gave the states considerable latitude in meeting the new substantive standard, subject only to the requirement that the state “find” its rates meet the Act’s standard, and to review by the Secretary. of the reasonableness of each state’s assurances that its rates meet the standard.
 
 Wilder v. Virginia Hospital Association
 
 (1990), 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455. A state’s findings, however, must be correct.
 
 Id.; Bradley,
 
 983 F.2d at 1462;
 
 Pinnacle Nursing Home v. Axelrod
 
 (2d Cir.1991), 928 F.2d 1306, 1314.
 

 Indiana’s long-term health care facilities operate under a state health care regime in which separate agencies have distinct but interrelated roles.
 
 Lett,
 
 965 F.2d at 254. The State Board of Health is responsible for licensing and certification while the Department of Public Welfare (hereinafter referred to as the State) administers the Medicaid program and establishes Medicaid reimbursement rates for these facilities.
 
 Id.
 

 The State has never approached Medicaid reimbursement by setting out initially to define an efficient and economically operated facility or to discern the necessary costs of a desired level of care. Instead, the model of an “efficient and economically operated facility” is implicit in the state’s prospective payment program. It varies'from provider to provider and is dependent ultimately on how the particular provider’s projected expenditures compare with its own historical costs adjusted for inflation, the adjusted historical and projected costs of other providers in the region, and the average rate of change of prices within the nation.
 
 [2]
 
 At the time in
 
 *1349
 
 question, initial interim rates were calculated based upon a provider’s projected costs of operating for the first nine months, and were subject to the tests of reasonableness. 470 I.A.C. 5-4.1-5(a). The methodology beginning at 470 I.A.C. 5-4.1-6 was used to compute initial interim rates for new providers, except that historical data was not available, and the annual rate increase limitation did not apply. 470 I.A.C. 5-4.1-5(b).
 

 The record reflects that Indiana’s Medicaid reimbursement system does not pay for the care of a hospitalized patient when that patient’s condition reaches a point of stabilization, even though in the physician’s eyes, the patient may still need the kind of care provided exclusively by facilities licensed as hospitals in Indiana, or something less than this care, what Lifelines’ characterizes as sub-acute care. Because of its legal and ethical duties to its patients, the facility providing these services may be forced to bear the cost of the patient’s continued care until the patient can be safely relocated to a skilled nursing facility.
 
 [3]
 
 Indiana’s Medicaid system thus contains an incentive to encourage the release of patients to long-term care. When patients who are in a sense sicker are released to long-term care facilities, they are treated by the system as requiring the same level of care as patients with lesser skilled care needs. Again, the facilities must absorb the unreimbursed cost. Pediatric patients, regardless of their particular medical needs, require greater care than geriatric patients.
 

 Lifelines has chosen to serve patients which fall into both high level care groups. Lifelines is a 59-bed pediatric health care facility with 39 patients which specializes in providing services to children who typically have been hospitalized for a major injury or illness and need a higher degree of care than routinely provided by a skilled nursing facility. When Lifelines’ founders began exploring the need for its services, they learned that the State’s Medicaid plan did not differentiate its unique combination of services from other levels of skilled care. Nevertheless, Lifelines became licensed as a comprehensive care facility, rather than a hospital, which allowed it to provide skilled or intermediate long-term nursing care, not acute care, and certified as a skilled nursing facility by the Indiana State Board of Health.
 
 [4]
 
 It then entered into a provider agreement with the State for reimbursement as a skilled nursing facility in accordance with its license and certification status.
 

 Hence, the State established Lifelines’ initial Medicaid rate as it would the rate of any
 
 *1350
 
 other skilled nursing facility. The State’s payment of $66.16 per patient per day reimburses Lifelines for only 22.4% of its actual costs. The question we must address is whether federal or state law compels the State to reimburse Lifelines’ costs in providing pediatric sub-acute care. Can the Department simply make a policy decision that it will not modify its reimbursement formula to sustain this type of specialization so long as there are facilities providing pediatric and “sub-acute” care to the patients who need it? We conclude that the Boren Amendment permits it to do so.
 

 A provider aggrieved by an administrative determination of the State Board of Public Welfare may seek judicial review of the Board’s decision pursuant to Ind.Code 4-21.5-6.1. See I.C. 4-21.5-2-6; 470 I.A.C. 5-4.1-27(a); 470 I.A.C. 1-4 — 7. Judicial review, however, does not mean unlimited review.
 
 Indiana Dept. of Natural Resources v. United Refuse Co.
 
 (1983), Ind., 615 N.E.2d 100, 103.
 

 The legislature has provided that relief shall be granted by a court only if it determines that a person seeking judicial relief has been prejudiced by an agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority or limitations, or short of statutory right; without observance of procedure required by law; or unsupported by substantial evidence. I.C. 4-21.5-5-14. Judicial review of disputed issues of fact must be confined to the agency record. I.C. 4-21.5-5-11. The court may not try the case de novo or substitute its judgment for that of the agency.
 
 Id.
 

 Consequently, the trial court acts as an appellate court when it reviews an administrative order and simply analyzes the record as a whole to determine whether the administrative findings are supported by substantial evidence.
 
 United Refuse,
 
 615 N.E.2d at 103. The role of factfinder lies with the administrative law judge who makes proposed findings and recommends an order to the Board.
 
 See id.
 
 at 104. The Board may adopt the recommendations of the ALJ, may amend or modify the recommendations, or may make such order or determination as is proper on the record. 470 I.A.C. l-4-5(d); 470 I.A.C. l-^-6(e). A reviewing court must give some deference to an administrative agency’s conclusions of fact, but no such deference need be accorded an agency’s determination of matters of law.
 
 Indiana Dept. of Public Welfare v. Payne
 
 (1993), Ind., 622 N.E.2d 461, 465. The standard used to review an administrative decision on the State’s compliance with the Boren Amendment is substantially similar to that utilized by the Indiana Supreme Court to review a judgment in favor of a class of nursing facilities on a substantive Boren Amendment claim, see
 
 Ti-oga Pines,
 
 622 N.E.2d 935, and is akin to the review provided by the federal courts.
 
 See e.g., Wilder,
 
 496 U.S. at 520 n. 18, 110 S.Ct. at 2523 n. 18;
 
 Arkansas Medical Society, Inc. v. Reynolds
 
 (8th Cir.1993), 6 F.3d 519, 529 (application of arbitrary, and capricious standard; review must include a determination of whether state plan complies with requirements of federal law);
 
 Abbeville General Hospital v. Ramsey
 
 (5th Cir.1993), 3 F.3d 797,
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1542, 128 L.Ed.2d 194;
 
 West Virginia University Hospital, Inc. v. Casey
 
 (3d Cir.1989), 885 F.2d 11,
 
 affirmed,
 
 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (on attorney fee question);
 
 Amisub v. Colorado
 
 (10th Cir.1989), 879 F.2d 789;
 
 Colorado Health Care Ass’n v. Colorado Dept. of Social Services
 
 (10th Cir. 1988), 842 F.2d 1158.
 

 Here, the administrative agency found that “during the relevant period, Lifelines provided long-term skilled nursing services to Medicaid pediatric patients who were properly placed in long-term skilled care by the patients’ attending physicians with approval by the State Welfare Department” and that those of Lifelines’ patients who were Medicaid eligible would not have been in a hospital had they not been admitted to Lifelines. The Board also found that Lifelines’ rate of reimbursement had been issued consistently with the lawful provisions of the Long-term Care Rate Reimbursement criteria; that Lifelines was not entitled to any additional reimbursement for its services; that Lifelines’ rate was consistent with any and all
 
 *1351
 
 federal and/or state statutory or regulatory standards; and that no exception was warranted nor permissible under the statutes, rules or regulations.
 

 Upon judicial review of the' Board’s decision, the trial court found the Board’s factual findings to be unsupported by substantial evidence, arbitrary, capricious and an abuse of discretion because implicit in these findings were the factual determinations that Lifelines provides the same level of care as other skilled nursing facilities and that three hours of nursing care per patient day is sufficient for the care of Lifelines’ patients. The court also found the Board’s explicit finding, that the Medicaid eligible patients would not have been in a hospital had they not been admitted to Lifelines long-term, to be unsupported by substantial evidence, arbitrary, capricious and an abuse of discretion. With respect to each of these factual matters, the level of care provided by Lifelines, the number of nursing hours per day necessary to care for Lifelines patients, and the situs of their care had Lifelines not been providing that care, the court found upon the record that a reasonable mind must reach the opposite conclusion.
 

 The court also found that a reasonable mind must conclude that Lifelines necessarily incurs higher costs than ordinary geriatric skilled nursing facilities because (a) it provides a more intense level of care; (b) it treats only children; and (c) it must comply with state licensing requirements for pediatric facilities. It found as a fact that the State calculated Lifelines’ rate without regard for the level of care Lifelines provides or the costs it must incur to provide necessary care and meet state licensing requirements, and that the State determined the reasonableness of Lifelines’ costs by comparing those costs to costs incurred by providers that were not similar to Lifelines.
 

 Upon these factual findings, and citing the pertinent language of the Boren Amendment, the court concluded, among other things, that the rate provided by the State violated both federal and state law in that it was “not reasonable and adequate to meet Lifelines’ costs of providing care at a level of quality and safety that meets the needs of its patients” and the rate was established “without regard for the level of care Lifelines provides or the costs it must incur to provide necessary care to children and meet state licensing requirements.” It also concluded that, contrary to its own regulation, 470 I.A.C. 5-4.1-10(d), the State applied its reasonableness criteria to Lifelines by comparing it with dissimilar providers. The court remanded the matter to the Board for recalculation of Lifelines’ rate.
 

 The HCFA is charged with the responsibility of interpreting the Boren Amendment, and its interpretation is entitled to deference.
 
 Folden v. Washington State Dept. of Social and Health Services
 
 (9th Cir.1992), 981 F.2d 1054. The Secretary received requests during the comment period on the proposed federal regulations implementing the Boren Amendment for a regulation requiring a state’s definition of allowable costs to include all expenses necessary to meet certification, licensing and health standards. The Secretary declined to impose such a rule with the response that “[wjhile [the HCFA] believe[d] that these costs necessarily must be reimbursed as part of. a reasonable and adequate
 
 rate
 
 paid to an efficient and economically operated facility, [the HCFA did] not feel it necessary to add a separate requirement to specify this.” “Allowability of these costs is embodied in the statutory requirement as set forth in the regulations at 42 C.F.R. 447.252(a).” Final Rule, 48 Fed.Reg. 56046, 56049 (1981) (to be codified at 42 C.F.R. § 447) (emphasis supplied).
 
 See also,
 
 H.R)Rep. 96-1479, 96th Cong., 2nd Sess. 154,
 
 reprinted in
 
 1980 U.S.Code Cong. & Ad.News pp. 5526, 5944 (In determining whether rates proposed by a state are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities, the Secretary is not expected to approve a rate lower than the applicable legal requirements would mandate).
 

 Under the State’s methodology, an initial rate is established “upon a pre-Boren type reasonable cost standard, without application of the GNP/ipd limiter.”
 
 Tioga,
 
 622 N.E.2d at 942. This means that, but for the market area limiter, which predated the Bor
 
 *1352
 
 en Amendment and had been approved by the HCFA, the State is effectively paying new providers the reasonable cost of services actually provided. In the Secretary’s judgment, an approved methodology under the reasonable cost standard necessarily produces a rate which complies with the Boren Amendment because the earlier plan had been subjected to a more rigorous statutory standard both substantively and in terms of federal review. 48 Fed.Reg. 56047. Even under this previous standard, one component of the chosen methodology may not meet the reasonable cost-related test if judged in isolation, yet the rate paid as a whole may meet the substantive standard because of the offset of some other aspect of the system, such as a liberal incentive payment. 46 Fed.Reg. 47965.
 

 The State has determined that, with respect to staffing levels, three nursing hours per day is a reasonable allowance for a skilled nursing facility. By enacting the Boren Amendment, Congress intended to give the states the freedom to both define allowable cost items and set reasonable cost.
 
 Mississippi Hospital Association, Inc. v. Heckler
 
 (5th Cir.1983), 701 F.2d 511, 515. Lifelines initially requested an additional 1.4 nursing hours per day, but, at the time of the hearing, had determined that it was actually providing 6.9 hours per day and that a more reasonable request would be 6 hours of nursing care per day. Lifelines’ executive officer testified that the State Board of Health imposes stricter and more costly requirements for the care of children than it does for geriatric patients, and delineated those additional requirements on the record. He clarified, however, on cross-examination, that he was not saying that by virtue of these regulations Lifelines’ hours of recognized care should be doubled or tripled.
 

 We are not aware of any evidence in the record establishing either that the three hours of nursing care allotted is insufficient to meet the requirements imposed for pediatric care by the State Board of Health or the extent to which it is insufficient. The testimony is simply that Lifelines’ patients need an additional three hours of care per day. This being the ease, we are unable to conclude that the State has failed to pay a rate which is reasonable and adequate to meet the costs which must be incurred by efficient and economically operated facilities to comply with state pediatric licensing requirements. Even were there evidence in the record to support an adjustment in Lifelines’ reasonable allowable costs for pediatric nursing care, we cannot discern a violation of the Boren Amendment or state statutory law because Lifelines received an incentive payment which may offset any deficiency in its reasonable allowable costs and make the overall rate reasonable and adequate.
 

 We find a conflict in the evidence concerning whether those patients of Lifelines who are Medicaid recipients would be hospitalized; hence, the Board could have determined that they would not be.
 
 [5]
 
 But, apart
 
 *1353
 
 from the adequacy of the record, we find the resolution of this question and the findings concerning the level of care actually provided to be simply immaterial.
 

 Admittedly, there is imprecision in the State’s reimbursement system: the State’s Medicaid plan does not especially reimburse sub-acute care whether it be provided by a hospital or skilled nursing facility. Rather, the plan distinguishes only between acute and skilled nursing care and broadly defines skilled nursing care, incorporating sub-acute care as well as both geriatric and pediatric care into the skilled care category. The plan makes exception only for ventilator care and the treatment of head trauma.
 

 But, the express command of the Boren Amendment, that payment be “determined in accordance with methods and standards developed by the states,” and the amendment’s legislative history make clear that Congress left the task of identifying the significant cost-influencing factors to be incorporated into a state’s rate-setting formula to the state, not the courts.
 
 Mary Washington,
 
 635 F.Supp. at 899.
 
 Accord Mississippi Hospital Association,
 
 701 F.2d at 515. Unless the costs which are incurred are costs which must be incurred by efficient and economically operated nursing facilities to comply with federal and state quality of care standards, or reasonable access to care is not being provided under the State’s plan, neither the Boren Amendment nor its state statutory counterpart is violated by the State’s selection, inherent in its plan, of the most efficient and economical means of providing sub-acute health care to the pediatric poor,
 
 see Mary Washington,
 
 635 F.Supp. at 899, namely, by reasonably and adequately reimbursing those facilities which by the nature of their case mix can provide the greater level of care at the least cost to the State.
 
 See Lett,
 
 965 F.2d at 259, 260. The Boren Amendment and relevant principles of administrative law give the State broad legal power to determine the scope of the statutory words “reasonable and adequate.”
 
 Hoodkroft Convalescent Center, Inc. v. New Hampshire
 
 (1th Cir.1989), 879 F.2d 968, 972. Imprecision can be justified by the need to contain cost and the difficulty of devising a more precise cost containment system.
 
 Mississippi Hospital Ass’n,
 
 701 F.2d at 519;
 
 Mary Washington,
 
 635 F.Supp. at 899.
 

 The question of whether the State must make exception for a facility providing a higher level of care than its certified counterparts was precisely the issue in
 
 Lett,
 
 965 F.2d 251. In that case, the facility, Hamilton Heights, had been created to specialize in providing services predominantly to severely and profoundly mentally retarded individuals with severe multiple medical disabilities. In 1984, the State Board of Health established an intermediate level of care between an intermediate care facility (ICF) (geriatric) and an intermediate care facility for the mentally retarded (ICF/MR). Hamilton Heights
 
 *1354
 
 became licensed to provide care at this Rule 7 ICF level.
 

 As a Rule 7 ICF, Hamilton Heights found that it was now more costly to comply with state licensing standards, and maintained that the increased costs of compliance necessitated a concomitant increase in reimbursement rates. When Hamilton Heights was reimbursed by the State Medicaid Plan at the ICF level, it sought an order from the federal courts declaring that the State’s failure to reimburse costs which it incurred as a consequence of its provision of care under the standards employed by the State Board of Health at the Rule 7 ICF level was arbitrary and capricious and therefore violated the federal and state Medicaid substantive standards.
 

 Like Lifelines, Hamilton Heights succeeded in convincing the district court that its documented, uneontested costs were “reasonably necessary for the facility to provide care and services in conformity with state and federal law,” and that its costs were “costs which must be incurred in order to provide legally sufficient care and services,” 965 F.2d at 257; therefore, the State must reimburse these costs and the failure to do so was arbitrary and capricious. The Seventh Circuit reversed, concluding that the district court had misapplied the Boren Amendment substantive standard when it determined that the State must reimburse the actual costs which a particular facility had incurred to provide legally sufficient care and services.
 
 Id.
 
 The court observed that the Boren Amendment had been enacted to move the states away from the payment of the reasonable costs of services actually provided. Accordingly, the amendment was violated only when the state’s rates in the aggregate were arbitrary and capricious.
 
 Id.
 
 at 257.
 

 The court also held that “reasonableness” under the amendment embraced the notion that the State may reasonably categorize its rates.
 
 Id.
 
 (citing
 
 West Virginia University Hospital, Inc. v. Casey
 
 (3d Cir.1989), 885 F.2d 11). Consequently, there was nothing arbitrary and capricious or unreasonable in the State of Indiana’s refusal to tailor its reimbursement scheme to each participating facility.
 
 Id.
 
 at 260. A state may require some uniformity among facilities,
 
 id.
 
 at 261, and assume that all facilities within the same general level of care category had a “mix” of residents with, on the average, the same need for services. In the absence of a showing that a particular facility is unable to obtain reimbursement for expenses it must incur at the higher certification category of care, the onus is reasonably put upon the facility, not the State, to obtain a better rate by changing its licensing status.
 
 Id.
 
 at 260.
 

 Lifelines chose to specialize in high level care pediatric patients because it perceived a medical need for this type of nursing facility in the state and began operating with the knowledge that the State’s Medicaid program would not be responsive to its projected actual costs. The State need not pay for the care provided by Lifelines if a more efficient and economical option is available. Congress clearly intended to allow the states to engage in price-conscious “shopping” for services for Medicaid recipients.
 
 Mary Washington,
 
 635 F.Supp. at 899. Under
 
 Lett,
 
 if a facility can obtain reasonable and adequate reimbursement for the care and services it provides by meeting the licensing and/or certification standards of a higher recognized category of care, the State need not fine-tune its system for the anomaly. Hence, it is our conclusion that the State need not create an exception to its Medicaid reimbursement plan for Lifelines in order to comply with federal and state statutory law. Neither has the State misapplied its own regulations by comparing Lifelines to other “dissimilar” skilled facilities.
 

 The judgment of the trial court is reversed and the decision of the State Board of Public Welfare ordered reinstated.
 

 BAKER and NAJAM, JJ., concur.
 

 [1]
 

 . At the time in question, Ind.Code 12-1-7-17.-2(b) provided: [pjayment of skilled nursing facility and intermediate care facility services shall, under 42 U.S.C. § 1396a(a)(13)(A), be determined in accordance with a prospective payment rate that is reasonable and adequate to meet the costs that are incurred by efficiently and economically operated facilities in order to provide care and services in conformity with state and federal laws, rules, regulations, and quality and safety standards with a growth or profit factor, as determined in accordance with generally accepted accounting principles, in accordance with rules adopted by the department.
 

 [2]
 

 . Under the State’s formula, once the State obtains an allowable cost for a particular provider and any incentives are added, the provider’s rate is established at the lowest of five limiters: the market area limiter (a percentage of average allowable cost computed from projected data submitted by providers for rate reviews on a regional basis, weighted by certified beds for the same 1ype of providers); the calculated rate (allowable per diem costs plus an incentive); the maximum allowable annual rate (increase in pri- or rate of reimbursement not greater than the most recent twelve-quarter average rate of change in the Gross National Product Implicit Price Deflator); the rate paid to the provider by the general public; or the reimbursement rate requested by the provider. 470 I.A.C. 5-4.1-9. Lifelines received its calculated rate.
 

 The State calculates .a provider's total "reasonable allowable costs,” i.e. the price a prudent,
 
 *1349
 
 cost conscious buyer would pay a willing seller for goods or services in an arm’s length transaction, 470 I.A.C. 5-4.1-2, by subjecting the provider's budgeted costs to three levels of review for reasonableness. First, the projected budget is reviewed by line item. Each line item expenditure is compared with the provider’s previously-submitted financial report. At this level of review, line items may be adjusted to the annual financial report per diem cost "inflated.” At the second level of review, projections above the seventy-fifth percentile in total routine per diem cost, i.e. total per diem costs of those items generally required to assure adequate medical care and personal hygiene of patients by providers of like level of care, are compared by cost center (category) and total to the provider's annual financial report data. Adjustments are again made to the "inflated” per diem cost reflected in the provider’s annual financial report. Lastly, a comparison of the provider’s budgeted per diem cost with the allowable per diem cost of other providers is made by cost center with a 90fh percentile ceiling imposed for each category, i.e. nursing, dietary, laundry and housekeeping, general and administrative, and employee benefits. This third level of budget review is performed only on those budgets with total per diem cost above the 75th percentile. 470 I.A.C. 5 — 4.1-10.
 

 For much of the period in question in this appeal, the "details" of the tests of reasonableness had not been promulgated. However, 470 I.A.C. 5-4.1-10(b) provided that
 

 [i]n determining the reasonableness of costs, the department may compare major cost centers or total costs of similar providers in the state and may request satisfactory documentation from providers whose cost does not appear to be reasonable. Similar providers are those with like level of care, size and geographic location.
 

 Indiana Board of Public Welfare v. Tioga Pines
 
 (1993), Ind., 622 N.E.2d 935, 941-2.
 

 [3]
 

 . There is a settlement procedure at the end of the year through which the hospital may be compensated for some of these unreimbursed costs.
 

 [4]
 

 . After it became apparent that Lifelines would be able to obtain a greater rate of reimbursement for its services as a hospital. Lifelines became licensed and certified as a hospital. That is why only its initial interim rate is in dispute.
 

 [5]
 

 . Lifelines offered the testimony of Dr. Joe Hannah, its medical director since 1988, and Ann Ruhmkorff, R.N., its director of nursing, on the factual question of whether the Medicaid eligible children at Lifelines would he hospitalized if Lifelines were not providing their care. Dr. Hannah testified that many of the children at Lifelines were too unstable to be cared for in a routine nursing home and were as sick as most patients in a hospital. He opined that three-fourths of Lifelines’ patients would probably need to be hospitalized while the other group would be in a custodial care facility and not getting the care they needed. Ruhmkorff testified that there were patients admitted to Lifelines from the hospitals who would be required to remain in the hospital were it not for Lifelines. She referred particularly to some of Lifelines’ infant patients. When asked specifically whether she could say for sure which of these patients were Medicaid eligible, Ruhmkorff could not be certain.
 

 The State offered the testimony of Betty Hutchinson, an R.N. who is a nursing consultant for the State Welfare Department and who performs the medical admissions review for all nursing home placements; LaDena Roux, an R.N. who manages the special care unit for the State's contractor Blue Cross; and Sarajoan Norcross, an R.N. who manages the precertification unit for Blue Cross on the issue of hospitalization. Hutchinson testified that before a patient is admitted into long-term care, a physician must certify that the patient meets the criteria for skilled care. Each patient is prescreened by a physician-nurse-social worker team to determine the appropriate level of care but the initial determination is ultimately made by Hutchinson. Hutchinson reviewed the records of each of the Medicaid eligible children at Lifelines and con-
 
 *1353
 
 eluded that each meets the criteria for skilled care. She opined that if these children were not at Lifelines they would probably be at another skilled children's facility. Roux testified that at least every sixty days, the patient's physician must recommend that the patient's level of care be continued. She went through the records to show these recommendations. Norcross testified that she is the person responsible for approving acute care and that she had reviewed the medical records of the Medicaid eligible patients at Lifelines and had determined that they were not eligible for hospitalization because their conditions had stabilized. If these patients were hospitalized, she would not approve Medicaid payment for their care. She also testified that there were a number of children who did go to Lifelines from hospitals for whom hospital care was not approved.
 

 In
 
 Indiana Dept. of Public Welfare v. Crescent Manor
 
 (1981), Ind.App., 416 N.E.2d 470, 474, this court stated that, in determining whether an administrative finding is supported by substantial evidence of probative value, the relevant inquiry upon judicial review is whether there is substantial evidence of probative value to support the agency's determination. The main inquiry is whether on the record the agency could reasonably make the findings it has made.
 
 Id.
 
 at 474. The administrative findings must have a reasonably sound basis of evidentiary support.
 
 Id.
 
 We have recited a reasonably sound basis of eviden-tiary support for the Board’s finding that the Lifelines patients who were Medicaid eligible would not have been in the hospital had they not been admitted to Lifelines. While Lifelines' witnesses did indeed opine that most of Lifelines’ patients would be in a hospital were it not for Lifelines, these opinions were not patient specific and the State’s evidence showed that as to the patients that were Medicaid eligible, they were properly placed in skilled care by the patients' attending physicians with approval by the State Welfare Department.